[No. 14428.  *En Banc.*  October 1, 1918.]

MAUD MORRISON, *Administratrix etc., Respondent,* v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, *Appellant.*[1]

MASTER AND SERVANT—INTERSTATE COMMERCE—EMPLOYERS' LIABILITY ACT. A foreman in charge of a building and bridge gang is not employed in interstate commerce, within the meaning of the Federal employers' liability act (35 Stat. 65), while he was engaged in unloading concrete tiling to be stored for future use in replacing wooden culverts, the place and time of its use being indefinite; since it did not directly and immediately tend to facilitate the movement of interstate commerce.

SAME. In such case, the fact that the tiling was part of an interstate shipment, and was being unloaded a very short time after its arrival, did not impress it with an interstate character so as to make its unloading a part of interstate transportation.

HOLCOMB, J., dissents.

Appeal from a judgment of the superior court for Spokane county, Blake, J., entered June 20, 1917, upon the verdict of a jury rendered in favor of the plaintiff, in an action for wrongful death. Reversed.

*Geo. W. Korte* and *Cullen, Lee & Matthews,* for appellant.

*Plummer & Lavin* and *H. J. Kinzel,* for respondent.

CHADWICK, J.—This action was brought by Maud Morrison, as administratrix, to recover damages suf-

[1]Reported in 175 Pac. 325.

fered by her and her two minor children through the death of the husband and father, Jean Morrison.

On the 6th day of September, 1916, Jean Morrison was a foreman in charge of a building and bridge gang of the appellant. His division extended from St. Maries, Idaho, to Malden, Washington. Morrison was an experienced man in his employment. A part of the equipment of the bridge gang was a gasoline car. The day before the accident, Morrison had repaired the brake-blocks by nailing a strip of iron along the face. He went to Spokane in the afternoon and returned at noon the next day, meeting up with his gang at about noon. During his absence one Weller was in charge. He took the car out of Plummer in the morning. The crew were accustomed to ride on it to and from their work. The brake-blocks dragged the wheels, and the car had great difficulty in making the grade, which is fairly heavy at that point. Weller took it upon himself to remove the iron shoes. Morrison arrived at Mowry, where the gang were employed, about noon and took charge of his crew. The gang were engaged in unloading concrete tiling to be used in replacing wooden culverts. The tiling had been shipped from Spokane on five cars and had landed at Mowry, which is a blind siding west of Plummer Junction, three days before. At about 5:30 p. m., Morrison went to a telephone booth, which is maintained for the convenience of appellant's employees, and called the agent at Plummer. The agent details the conversation:

"Q. Tell the jury what Morrison said to you when he called you on the phone. A. When he rang and I answered, he said: 'Hello, Frank.' I said: 'Hello, Jean.' He said: 'How is second 63?' I said: 'They are at Peedee. I was just talking to the conductor and they will be at Plummer or out here just ahead or behind 27.' He said: 'All right, Frank, I am coming

down the mountain.' That is all that was said, and he hung up.''

First 63 is a regular freight west bound, and second 63 is probably a second section of the same train. We do not remember that the record makes this clear. First 63 was due at Plummer Junction at 10:34 a. m., and at Mowry at 11:25 a. m. While the men were eating their dinner, a west bound freight passed. It carried white flags to indicate that it was an irregular train. It is the theory of counsel for appellant that Morrison negligently assumed that this train was first 63, having passed Mowry at about the time first 63 would be expected to pass, and it was for this reason that he asked for the whereabouts of second 63, which he would have reason to believe would follow the first of that number.

One or more of the witnesses say that Morrison said, just before going to the telephone, that he was going to get a line up, which means information as to the movement of trains. The witnesses say that, when he returned, ''He said we had clear sailing to Plummer Junction.'' The men got on the car with Weller at the lever. Morrison and three others were riding on the front end of the car. They had gone about a mile and a half when they came upon a freight train about 300 feet away and coming down the hill. All of the men got off the car, Weller being the last to leave it, but Morrison, who was standing up crying, ''Stop it, stop it,'' was killed by the passing train.

Negligence is alleged in two counts. First, that appellant was negligent in that it gave, through the agent, wrong information as to the location of the train which collided with and killed Morrison; and second, that the brake-shoes on the gas-car had, without his knowledge, been tampered with by one of his men and so changed that their brakeage power was insufficient to stop the car and avoid the collision after the train was sighted.

Aside from the question of negligence, the main contention of the appellant is that the deceased was not "employed in interstate commerce" as the term has been defined and applied by the supreme court of the United States when considering the Federal employers' liability act (Act April 22, 1908, ch. 149, 35 Stat. 65 [U. S. Comp. St. 1916, §§ 8657-8665]).

Counsel for both sides assume to cite apt authority to sustain their respective contentions and quarrel violently as to what the supreme court has held under the act. Counsel for appellant insists that the later opinions of the court indicate a recession from the holdings of some of the earlier cases, notably *Pedersen v. Delaware, L. & W. R. Co.*, 229 U. S. 146, Ann. Cas. 1914C 153, upon which respondent confidently relies; while opposing counsel insists, with an equal show of authority, that the court has not questioned, but has rather reaffirmed, the *Pedersen* case, and proves his position by reference to later decisions of the court which cite the *Pedersen* case as authority. It would lead to no result worth while to review the several opinions of the supreme court with a view to judicially declaring our opinion of the attitude of the court toward the *Pedersen* case. All of the decisions of that court are learned discussions when read in the light of the facts of the case at hand, but they are not always helpful as authority. They are, in some respects, seemingly contradictory. It could hardly be otherwise, for the employer being engaged in interstate commerce and intrastate commerce at one and the same time, it would seem to be impossible to lay down a general rule which would govern in every case. To quote from a writer in the Docket, Vol. 2, No. 39, April 1918:

"The chief difficulty, perhaps that is usually met with in the attempt to solve the question, is due to the

fact that practically all railroad tracks, and a large proportion of other railroad facilities, are used in both interstate and intrastate commerce, so that the line of demarcation, the 'twilight zone,' between the two uses, is necessarily uncertain and incapable of being reduced to a state of certainty.''

However, much is made of the definition in the *Pedersen* case and repeated in several succeeding cases, ''The true test always is—is the work in question a part of interstate commerce in which the carrier is engaged;'' which to the writer is no definition at all. It conveys no more meaning than the letter of the act itself which permits a recovery if the one injured is at the time ''employed in interstate commerce.'' The question, ''What is interstate commerce?'' is still open, for, as said in the same case, ''In order to clothe an employee's employment with an interstate character, it must be shown that the work that he is performing had some direct relation and immediate connection with the interstate commerce of the employer.''

We find ourselves unable to harmonize the decisions of the supreme court upon the Federal employers' liability act. It is patent, however, that the law is intended to be applied in spirit rather than by letter. It is useless to attempt an accurate definition of an act, or series of acts, which will bring a case within, or place it without, the provisions of the statute. As it seems to us, the dominant thought underlying the question of whether in a given case an employee was or was not engaged in interstate commerce is this: Would the performance of the act in which the employee was engaged directly and immediately tend to facilitate the movement of interstate commerce, or conversely, would the failure to perform the act directly and immediately interfere with or hinder the movement of such commerce? In applying this test the three essential fac-

tors to be considered are time, place and intent. That is to say, was the act which the employee was performing, in point of time, place and intent, so directly connected with interstate commerce as to constitute an integral part of interstate transportation. If it was, the employee is entitled to the protection of the act. If not, he is not. This brings us, as in all cases brought under the act, to the facts of the instant case. The work being done and its relation and connection with the interstate commerce of the employer, or its lack of such relation and connection, must be found in the record. We shall quote all of it that pertains to the subject. ·We have italicized the more pertinent parts. The head carpenter testified:

"Direct:   Q. And state whether or not you had charge of the providing of the materials for the use of this gang in keeping up this roadbed as I have described? A. Yes, sir. Q. Do you recall the work that was being done on the 6th of September last at Mowry by Mr. Morrison and his gang with reference to unloading some concrete pipe? A. Yes, sir. Q. State whether or not that concrete pipe was company property for repairs, to use as repairs? A. *That was company property and not to be used as repairs, it was to be used as renewals.* Q. Was for what purpose as renewals? A. *Renewal of culverts, when the old culverts live their life out.* Q. In other words, it was company material? A. Yes, sir, company property. Q. *Yes, to be applied to the roadbed whenever needed to be applied?* A. *Yes, whenever proper.* Q. Where did that come from? A. I think it came from Massy & Company of Spokane, and was ordered through them. Q. Was shipped from Spokane to Mowry? A. As I remember, it was, yes, sir. Q. This unloading was done shortly after it arrived there, was it? A. Yes, sir, a very short time."

"Cross:   Q. And there were five cars spotted on this siding for unloading at that point two or three days before they were unloaded? A. Yes, sir. Q. They

had remained there at that point with these loads on for that purpose, and the purpose of your unloading this tiling at those points was to store them for future use in connection with the railroad at some point? A. Yes, sir. Q. *The tiling has not yet been used?* A. *It has not.* Q. It is there to this day? A. There now. Q. All the tiling that was unloaded under the superintendence of Mr. Morrison? A. Yes, sir. Q. The tiling that was unloaded on the day that Mr. Morrison was hurt and was superintended by him have not been devoted to any use whatsoever in connection with the railroad at this time? A. They have not.''

An employee testified:

''Q. Where were those [tiles] placed that you speak of at Sorrento and Mowry? A. Under the culvert, to put under the track there for the water to run through. Q. Had you put in like culverts from time to time? Mr. Korte: I object as immaterial. The Court: Overruled. Q. Had you put in like culverts of like materials from time to time before that? A. We put in like it, yes, sir, not at that place, though. Q. No, but at different places on the line, like material? A. Yes, sir, put in wood. Q. No, I say like material, material of the same character as this same kind of piping? A. Yes, sir, we had. Q. What was the purpose of putting that in, if you know, on the roadbed? A. Why for the water to run through. Q. You mean water running under the track? A. Yes, sir. Q. Was that the custom, to use it where it was unloaded or in that close vicinity? A. In that close vicinity, yes, sir.''

Another employee testified:

''Q. During that time you worked in the same gang, I presume? A. Yes, sir. Q. What you call the bridge gang? A. Bridge and building crew. Q. All right. And along that same division? A. Yes, sir. Q. Extending from Malden to St. Maries? A. Yes, sir. Q. And engaged in the same class of work keeping up the roadbed? A. Yes, sir. Q. What kind of work were you doing? A. At what particular time, please? Q. Any place along there between Malden and St. Maries when they had this car in use. A. Repairing bridges.

Q. Repairing bridges? A. Yes, sir. Q. And putting in culverts? A. Yes, sir. Q. Concrete culverts? A. Yes, sir. Q. How long a time did that extend that you had this car with you, doing that kind of work? A. Well, during all that time I was under Mr. Morrison as a workman."

We had gathered the impression from respondent's brief and argument that the company was engaged in the carrying out of a definite program for the renewal of all wooden culverts with the concrete tiling, in which event we would incline to the belief that the act might fall within the benefit of the employers' liability act. But we hardly think the record when taken as a whole will bear out this assumption. If it were true, it would have been a matter of easy proof. Since negligence is not to be presumed but is to be evidenced by competent proofs—whether direct or circumstantial—we would not be warranted in presuming a fact in order to bring the thing done within the provisions of the act.

The unloading of the concrete tiles did not tend to facilitate interstate commerce, or, conversely, directly or immediately interfere with or hinder the movement of such commerce. It was work incident to the repair and upkeep of the road. It possessed the element, ultimate intent, but it lacked the other essentials, time and place. The record would not sustain a holding that the tiling or any other considerable part of it was to be used immediately or within a reasonable time. It was to be used as needed for replacements, and was being stored for such future use; the place of its use being uncertain and the time when it might be used being indefinite, it had lost, if it ever possessed it, the character of interstate commerce.

Although failing to harmonize the opinions of the supreme court, it does not follow that we cannot make profitable reference to them.

"The question, then, being one chiefly of fact, it follows that to a certain large extent the decision in each case will depend primarily upon the facts in that particular case; but much light may be thrown upon those facts, frequently, by careful consideration of what has been adjudicated by the higher federal courts in decided cases in which substantially similar facts have been involved." The Docket, Vol. 2, No. 39, April 1918.

Keeping in mind, therefore, that it is not every employee of a railroad doing an interstate business (this is the reef upon which the first employers' liability act was wrecked, *Employers' Liability Cases,* 207 U. S. 463), but only such as are directly and immediately connected with interstate commerce, let us look at the cases.

If deceased had been injured while putting tiling in place of the wooden culverts, or in going to or returning therefrom, the case would probably fall within the rule of *Horton v. Oregon-Washington R. & Nav. Co.,* 72 Wash. 503, 130 Pac. 897, 47 L. R. A. (N. S.) 8, but the storing for future use, with no showing except by barest inference that the material was to be used except as needed for replacements, takes the case out of interstate employment. The distinction, after reference made to state and Federal authority, is markedly pointed out in *Killes v. Great Northern R. Co.,* 93 Wash. 416, 161 Pac. 69. The court said:

"In *Horton v. Oregon-Washington R. & Nav. Co.,* 72 Wash. 503, 130 Pac. 897, 47 L. R. A. (N. S.) 8, we reviewed the cases then reported to determine a practical test to apply to cases that would fall within the act, and reached the conclusion that the employment of the injured servant must be in connection with some instrumentality used in interstate commerce, and that the relation of the employment to the interstate commerce must be such that an injury to the servant tended to hinder or delay the movement of trains engaged in such commerce. We sustained the action as within the

act in that case upon the theory that an employee whose duty it was to attend a pumping plant furnishing necessary water to interstate trains was employed in furthering the movement of interstate traffic as much as the fireman who stoked the engine, the switchman moving oil for use in an interstate engine, or the servant who repaired the engine or cars; and that in going to his employment by the means supplied by the master, he was under the protection of the act to the same extent as the fireman passing from one phase of his employment to another, in each of which cases the action has been sustained.''

The intended use of material is not a certain test, and although the tiling may have been thereafter actually placed in the roadbed, it would not follow that the act of unloading was directly or immediately connected with interstate business.

In *New York Central & H. R. R. Co. v. Carr,* 238 U. S. 260, the court took occasion to say, while distinguishing the case of *Illinois Cent. R. Co. v. Behrens,* 233 U. S. 473, Ann. Cas. 1914C 163 (two cars were being moved between two points in the same state when the plaintiff was injured): ''The fact that they might soon thereafter be used in interstate commerce did not affect their intrastate status.'' In *Chicago, B. & Q. R. Co. v. Harrington,* 241 U. S. 177, the employee had been engaged in switching certain coal belonging to the company from a storage track to a coal shed. After the coal had been put in the shed it was supplied to all locomotives as needed, and without reference to their character as interstate or intrastate instrumentalities. The only ground for invoking the liability act was that some of the coal thus stored would eventually be used as fuel by locomotives in interstate hauls. It was held that it was not material that deceased had been engaged in interstate commerce or that he might be so engaged thereafter.

"As we have pointed out, the Federal act speaks of interstate commerce in a practical sense suited to the occasion and 'the true test of employment in such commerce in the sense intended is, was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it.' *Shanks v. Del., Lack. & West. R. R.*, 239 U. S. 556, 558, and cases there cited. Manifestly, there was no such close or direct relation to interstate transportation in the taking of the coal to the coal chutes. This was nothing more than the putting of the coal supply in a convenient place from which it could be taken as required for use."

The coal had been on cars on storage tracks for a week or more—here the tiling had been on the track three or four days. Now substitute tiling for coal and we have a case almost identical with the case at bar. Instead of putting the tiling in a chute or warehouse it was stored on the ground, which, as the court says:

"Was nothing more than the putting of the coal [tiling] supply in a convenient place from which it could be taken as required for use."

See, also, *Delaware, L. & W. R. Co. v. Yurkonis*, 238 U. S. 439; *Lehigh Valley R. Co. v. Barlow*, 244 U. S. 183; *New York Cent. R. Co. v. White*, 243 U. S. 188, Ann. Cas. 1917D 629, L. R. A. 1917D 1; *Minneapolis & St. L. R. Co. v. Winters*, 242 U. S. 353, Ann. Cas. 1918B 54; *Salmon v. Southern R. Co.*, 133 Tenn. 223, 180 S. W. 165; *Hudson & M. R. Co. v. Iorio*, 239 Fed. 855; *Cincinnati, N. O. & T. P. R. Co. v. Hansford*, 173 Ky. 126, 190 S. W. 690.

The reader will note the testimony quoted in the *Hansford* case and compare it with that quoted by us. The facts make the cases identical. The *Iorio* case is valuable in that it points clearly to the obvious distinction between the *Pedersen* case and the cases cited above:

"There is plainly a difference between the actual or imminent employment of the bolts in repairing the bridge, as in the *Pedersen* case, and the mining of coal wherewith to run interstate locomotives, as in *Yurkonis* case. Whether such difference entails a distinction is· a matter upon which opinions might conflict, as the dissent in supreme court decisions under this statute clearly shows. But by the latest pronouncement of that court in *Minneapolis etc. Co. v. Winters,* 242 U. S. 353, 37 Sup. Ct. 170, 61 L. Ed.—January 8, 1917, it is in effect declared that when one claims the benefit of the act here invoked, because of the character or employment of the thing upon which he was working at the time of the injury, then the character of that thing 'as an instrument of commerce depended on its employment at the time (of injury), not upon remote probabilities, or upon accidental later events.''

In *Missouri, K. & T. R. Co. v. Watson* (Tex. Civ. App.), 195 S. W. 1177, the workman, a section-hand, was engaged in picking up ties that had been thrown on the right of way.on the same day and stacking them near a tool-house for use, at which time they would be loaded on a push-car and transported to a place where they would be used in the repair of the track. It was "concluded that the proof does not show that appellee was injured while engaged in interstate commerce.''

The case of respondent is fairly put by counsel. They say:

"The mere expectation or probability that the concrete pipe would be used, when being built or constructed, in maintenance of defendant's roadbed, would not be sufficient, of course, but again we say the evidence in this case shows to any reasonable mind that the concrete tiling was bought, transported and was being unloaded as a part and parcel of the acts and things necessary to be done in carrying on the work of upkeep and maintenance of this railroad.''

But the fault of this argument is that it leaves the fact upon which the legal conclusion must rest to in-

ference and puts the burden of proof on appellant, whereas the fact, if it were a fact, was capable of actual proof, at least to the extent of making a *prima facie* case. We note that counsel contends that one of the men employed testified that the tiling was to be used, as of course it was to be used, in the vicinity, and that tiling had theretofore been put in that vicinity; but, as we have said, the mere storing of supplies to make repairs or replacements when needed is not enough, for the employment lacks the element of time or reasonable time, which is the sustaining thought in the *Pedersen* case.

As a reason notwithstanding for supporting the judgment, counsel says that the tiling, having been shipped from Spokane, Washington, to Mowry, Idaho, was impressed with an interstate character, and being unloaded "a very short time after its arrival," it had not lost its character, and that the unloading was part of the interstate transportation. But if it be granted that supplies and materials bought by and transported by a carrier are indeed commodities and objects of interstate commerce within the meaning of the liability act, the contention is met by the court, upon which we must rely for our guidance, in the *Harrington* case, where the shipment had originated in Missouri and the accident occurred in Kansas. "With the movement of the coal to the storage tracks," says the court, "we are not concerned; that movement had long since ended." The cars had been on the storage tracks for a week or more. But we attach no particular importance to the reference to time. If the movement had ended and the thing transported were left ready for other movement by other hands, the element of lapsing time could not affect the rule one way or the other. So in *Pierson v. New York, S. & W. R. Co.*, 83 N. J. L. 661,

85 Atl. 233, new rails had been shipped from Buffalo, New York, to a station in the state of New Jersey, where they stood on the tracks for three or four days. They were then hauled to the place where they were to be put in place. The injury occurred in this movement. While we would doubt this case upon its main features (the decision upon which it rests was overruled, *Pedersen v. Delaware, L. & W. R. Co.*, 229 U. S. 146, Ann. Cas. 1914C 153), the court's reference to the question now presented seems to us to be consistent with the *Harrington* and the *Yurkonis* cases. It is:

"The transportation of the rails from Buffalo to Beaver Lake was interstate commerce, at least until they were turned over to the defendant *en route* for further carriage; but when they reached their destination at Beaver Lake they ceased to be an object of such commerce. In afterward transporting them from Beaver Lake to the point where they were to be used in replacement of the old rails the defendant company was not engaged in commerce at all, we think—certainly not in interstate commerce."

In *Lehigh Valley R. Co. v. Barlow*, 244 U. S. 183, it is mentioned in the syllabus that the cars, which had been hauled from the state of Pennsylvania to New York, had stood on the tracks seventeen days, but the writer of the opinion seems to attach no importance to the element of time. The case turns rather upon the holding that, "while removing them, the switching crew was not employed in interstate commerce."

It follows that plaintiff's case does not fall under the protecting influence of the Federal act, and that the action cannot be maintained.

Reversed, with instructions to dismiss.

MAIN, C. J., FULLERTON, MOUNT, PARKER, MACKINTOSH, MITCHELL, and TOLMAN, JJ., concur.

HOLCOMB, J. (dissenting)—I dissent. It is apparent to me that the handling of materials necessary to be used for the permanent maintenance of an interstate commerce railroad, as was the case here, by the employees regularly engaged in that work, was an act of interstate commerce, or in furtherance thereof, and therefore assuredly controlled by the Federal employers' liability act and the *Pedersen* case.