ROACH v. LOS ANGELES & S. L. R. R. CO.

No. 4529.  Decided May 24, 1927.  (256 P. 1061.)

*Willard Hanson* and *A. H. Hougaard*, both of Salt Lake City, for appellant.

*George H. Smith, J. V. Lyle, R. B. Porter,* and *Dana T. Smith,* all of Salt Lake City, for respondent.

STRAUP, J.

The appellant, plaintiff below, brought this action against the defendant under the Employers' Liability Act of Congress (U. S. Comp. St. §§ 8657-8665) to recover damages for personal injuries alleged to have been sustained by him whilst in the employ of the defendant. It is admitted that the defendant is a railroad common carrier engaged in interstate commerce and that the plaintiff was in its employ, but it was denied that he, at the time of the alleged injury,

was engaged in interstate commerce. At the close of all of the evidence adduced by both parties, the court, on defendant's motion, directed a verdict in favor of the defendant on the ground that the plaintiff at the time of the injury was engaged in intrastate and not interstate commerce. Plaintiff appeals. Thus, and as is contended by defendant, the only question presented by the appeal is the character of the work in which plaintiff was engaged at the time of his injury.

The defendant operates a line of railroad from Salt Lake City, Utah, to Los Angeles, California. From Salt Lake City to Lynndyl, Utah, a distance of 135 miles, it operates two lines of railroad, one called the main line running west of the Oquirrh range of mountains from Salt Lake City thorugh the towns of Garfield, Tooele, and Tintic Junction, to Lynndyl; the other east of the range from Salt Lake City through the towns of Provo, Payson, and Nephi, to Lynndyl. From Lynndyl westerly to Los Angeles there is but one line. Lynndyl is a division point. There the defendant maintains rather extensive yards in which are a number of side or switch tracks and house and rip tracks. There trains are what is called "broken up," cars put in and taken out of them, and cars taken out of one and put in another train, and trains made up. As testified to by the trainmaster of the defendant, when a train arrives at Lynndyl it is broken up and cars taken out and others put in. The plaintiff, at the time of his injury, and for more than a year prior thereto, was employed by the defendant as a switchman and assisted in switching cars in the yard. The crew consisted of a foreman, engineer, fireman, and two switchmen, of whom the plaintiff was one. The crew went on shift at 11 o'clock p. m. and worked till 7 a. m. Its duties were switching cars and trains in the yard coming to Lynndyl, and keeping the main line clear for the movement of passenger trains. In doing such work the crew switched all kinds of cars, interstate and intrastate, empty and loaded; took interstate and intrastate or local trains, and made up trains,

as the business and traffic required. There were two crews doing this work, plaintiff's crew going on duty from 11 p. m. till 7 a. m. and another crew going on duty from 3 p. m. till 11 p. m. There was no crew to switch cars of trains arriving at Lynndyl after 7 a. m. and departing before 3 p. m. Whatever switching was to be done between those hours had to be done by train crews.

On October 29, 1925, plaintiff and his crew went to work as usual at 11 o'clock p. m. switching cars in the yard. Among other trains coming to the yard during that shift was a train from the west called the "fruit block" train, an interstate freight train made up at Los Angeles. It carried meats, vegetables, lemons, oranges, and numerous other fruits, automobiles, machinery, and other commodities. It consisted of about 56 cars, some empty, and some loaded carrying shipments to Salt Lake City, to towns in Idaho, Montana, Wyoming, Iowa, Missouri, Illinois, Ohio, and New York. It carried an oil tank car from California destined to Garfield, Utah, a car destined to Payson, Utah, and a gasoline car destined to Sugar House, a suburb of Salt Lake City. Garfield is on the main line running from Lynndyl to Salt Lake City. Payson is on the other or branch line. This train arrived at Lynndyl at about 3:10 a. m. and departed at 4:30 a. m. October 30. On its arrival and before its departure plaintiff's crew cut out of that train the oil tank car destined to Garfield and switched it with other cars on what is called track No. 1. The cars destined to Payson and Sugar House were also cut out and switched on another track with other cars to be made up as a local train known as No. 96 made up at Lynndyl and running over the branch line from Lynndyl through Payson, Provo, to Salt Lake City. That train, though a local train from Lynndyl to Salt Lake City, yet carried at least two interstate cars to their destination switched by plaintiff's crew out of the fruit block train. The crew also switched about six cars in the fruit block train. During their shift other switching of cars was done, placing a string of cars on track No. 1 as well as cars on the track

for the local train, and cars on other tracks. Among other cars so switched in the yard, the crew, under orders of the foreman given by the trainmaster, took an empty water tank car from the house track to a water tank, there filled it, and then switched it on track No. 1, where the oil tank car destined to Garfield had been placed together with a number of other cars on that track. It was while making a flying switch of the water tank car to track No. 1 that the plaintiff was injured. The alleged negligence, of which there was evidence to support the allegation was that the engineer in making the flying switch ran and operated the water tank car at an excessive, dangerous, and negligent speed, thus not affording plaintiff safe means to board the water tank car to arrest its movement before coming in contact with the oil tank car on track No. 1; and that in his effort, as claimed by the plaintiff, to board the car to arrest its movement and prevent injury to it and to the oil tank car and other cars on that track, he, because of the charged negligence, was thrown to the ground and injured. The water tank car was operated at such a speed and with such force that when it struck the oil tank car that car was injured, and so injured the water tank car that it had to be taken to the rip track for repairs, and threw or tipped over a box car on track No. 1, which had to be raised and replaced to permit trains to pass on the main line. The water car so being switched was an intrastate car used for hauling water to cisterns on a division along the main line to supply men with water for culinary purposes working on the track; and without so supplying such workmen they could not carry on their work of repairing and maintaining the track, there being no other means or source to obtain water for them. The water tank car was filled and switched to be carried out on a division on the main line between Lynndyl and Salt Lake City.

There is some conflict in the evidence as to the character of track No. 1 on which the water tank car was switched. Evidence was given on behalf of the defendant to show that track No. 1 was what is called a "sluff track," a track on

which to store cars until such time as they are to be used or moved without knowing when they would be moved or what train would move or carry them out. On the other hand, there is evidence to show that track No. 1 was what is called a "fill," which consists of cars switched from other tracks or trains and placed on one certain track in rotation waiting a train to come and pick them up and take them out, and that the cars switched by plaintiff's crew on that track, of which there were a number, including the oil tank car and the water tank car, were to be taken up and carried out over the main line toward Salt Lake City by train No. 256 when it came along from Milford and points to the west from Nevada and California. The plaintiff testified that the oil tank car, the water tank car, and other cars switched on track No. 1 were placed there to go out on train 256. The defendant's trainmaster testified that the company expected to keep cars moving as rapidly as it could; that it endeavored to have the cars moved to a track where the first train could conveniently pick them up and carry them on; that there were a great many cars that had to be taken on besides cars that came in and were taken out of the fruit block train, and that all of such cars had to be moved by somebody and placed on the proper track for the continuation of their journey; that cars taken out of the fruit block train were put on track No. 1, which was right next to the main line, and with other cars from other trains were assembled on track No. 1, and that "train No. 256 coming from Milford and other points west from beyond the state would connect on the cars assembled on track No. 1"; that cars that were to go out on a particular train were placed on a particular track; and that it was the duty of the switch crew to place them in such close proximity to each other that they could easily be coupled when the train came in and so it would not be necessary to move them again. Defendant's supervisor and agent at Lynndyl testified that there was an order received to send out the water car before it was filled and moved about the yard for filling; that the fill-

ing of the car and moving it on a track indicated that an order was received to send it out and to go out on the first daylight freight train coming in after that time and that train 256 was the first daylight freight train to come in, and which came in October 30, and on which the water car could go out after being filled that morning; that when the order was received it meant that the water car was to go out on the next daylight freight train and that such information would be communicated, by whomsover receiving it, to the foreman of the crew so he would know what to do with it; that train 256 was a dead freight train and was such a train operating over the main line track as would take out the water car; and that the only train that could go out on Oct. 30 as a daylight dead freight or nonmanifest train was train 256. The foreman of the crew testified that his instructions were to fill the water car to go out on the next east-bound daylight dead freight, and that when they switched it on track No. 1 they were doing so for the purpose of having it in a place where it could be picked up by the first dead freight going east; that there was no other train made up that could take out the water car; that the orders were to fill the car and send it out on the first dead freight daylight train, and that was train 256; that he wanted all the east-bound cars together on one track so they could go out on the train going out over the main line; and that they placed the water car on the same track as the oil tank car which was to be delivered at Garfield.

Admittedly, the oil tank car and other cars on track No. 1 were to be and were taken out by train 256 when it came along. Evidence was given to show that the water tank car was so switched on track No. 1 that if train 256 had not taken it out it would have required considerable switching to get the oil tank car from track No. 1; that the switching crew placed the cars on that track so that when the train came along there would be as little switching as possible for the train crew; that the switching crew tried to have the oil tank car ready so as to go out on the first freight train that

could take it out, and that the first freight train to do so was train 256; and that if the water tank car was not to go the crew would have to switch the water car away from the oil tank car, put it on some other track, then come back and couple to the oil car.

Train 256 was an interstate train coming from California and Nevada and running to Salt Lake City, carrying interstate shipments. It is what is called a "dead freight train," a slow train, and while running on schedule, yet was irregular as to time, generally coming in the yard at Lynndyl each day between 8 a. m. and 12, noon. The fruit block train was what is called a "manifest train," and had the right of way over all other freight trains. Train 256, on October 30, the day of the accident, arrived in the yard at Lynndyl at about 10 a. m., was called to leave at 11:30 a. m., and left at 1:30 p. m. The oil tank car was switched on track No. 1 about 4 a. m., and the water tank car at about 6:45 a. m., when the plaintiff was injured, only about 10 or 15 minutes before the end of his shift. Train 256, when it departed, carried out the oil tank car and other cars on track No. 1. It did not take the water tank car, because, as claimed by the plaintiff, of the injury to it in switching and of its removal to the rip track for repairs where it remained until November 3. The trainmaster of defendant, however, further testified that while on some other occasions the water car was taken out by train 256, yet on this occasion it would not have been taken out by that train though the water car had not been injured, for the reason, as stated by him, that train 256 on this day had, when it arrived at Lynndyl, four loaded stock cars requiring delivery of them in Salt Lake City within 9½ hours after the train left Lynndyl (a distance of 135 miles), and hence it would not have been feasible to have carried the water car on that train on that occasion; and that to have done so would have too much delayed the train.

On these facts it is contended by appellant that there was sufficient evidence to show: (1) That he and his crew, at

the time of the injury, were engaged in switching the water car on track No. 1 for the purpose of connecting it with interstate cars on that track and with them to be taken out by and to become a part of an interstate train expected to arrive in the yard and depart therefrom within a few hours, and that such work was not done separately or independently of handling and switching interstate cars, but in connection therewith in making a fill of intrastate and interstate cars for a particular interstate train, and that such work thus was in furtherance of interstate commerce, or to facilitate it, or so directly or closely related thereto as to become a part of it; (2) that it being the duty of appellant to arrest the movement of the water car as it was being switched on track No. 1, not only to set it at rest at its proper place but to prevent it from colliding with and injuring the oil tank car and other interstate cars on track No. 1, his attempt to board the water car to prevent damaging it and the oil tank car and other interstate cars on the track itself constituted work so closely related to interstate commerce as to be a part of it; (3) that the movement of the water car, though an intrastate car used to carry water for culinary purposes for workmen engaged in repairing and maintaining the track of the defendant used in interstate commerce, was itself so closely and directly related thereto as to become a part of it.

On the other hand, it is contended by respondent that the water car, an intrastate car, was one used solely within the state to carry water to workmen working on the defendant's track in the state, and hence the movement of the water car in the yard related wholly to intrastate work or commerce; that the movement of the car in the yard was separate and independent from moving and handling any other cars in the yard, or from switching cars in or out of any train or trains, and was work which the crew was doing after it had finished switching and handling other cars in the yard, and that the doing of the one had no connection with or relation to the other; that the water car was placed on track No. 1, a sluff track, after the crew had finished its other work in

the yard, with no intent or purpose to be taken out at any particular time or by train 256, or by any particular train, and was just as likely to be taken out by a local freight train made up in the yard as by any other train, and in all events was not to be taken out except by a daylight dead freight train, and that train 256 on the day in question when it came in the yard was not a dead freight train because it then carried four loaded cars of livestock, and for that reason the water car would not have been carried out by that train had it not been injured.

On the record we think there is sufficient evidence, though in conflict, to warrant a finding that track No. 1 was not a sluff track, but a fill, and that at the time of plaintiff's injury the water car, with other cars, intrastate and interstate, were by him and his crew being switched on that track directly to be taken out by and to become a part of train 256, an interstate train, and that had the water car not been injured it would have been taken out by that train; and that switching or placing the water car on track No. 1 was part and parcel of work, and interwoven with it, of switching and placing cars on that track to make a fill for train 256, just as much so as switching and placing thereon the oil tank car and other interstate cars. Such conclusion is deduced from the evidence and the inferences therefrom considered in the light most favorable to the appellant. In reviewing the ruling we are required to and do regard the evidence in such light.

To bring himself within the provisions of the act, the plaintiff, of course, was required to show that the work at which he was engaged at the time of his injury was so directly or closely related to interstate commerce engaged in by defendant as to be a part of it. But, as was said in the case of *Shurtliff* v. *O. S. L. R. R. Co.*, 66 Utah, 161, 241 P. 1058, the difficult question in these cases is when may an employee be regarded as being engaged in such commerce and when not. In determining it there is no specific rule. There is only the general rule, and, as stated

in *Pedersen* v. *Delaware, L. & W. R. R. Co.*, 229 U. S. 146, 33 S. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153, *Southern Pacific Co.* v. *Industrial Acc. Comm.*, 251 U. S. 259, 40 S. Ct. 130, 64 L. Ed. 258, 10 A. L. R. 1181, *Industrial Comm.* v. *Davis*, 259 U. S. 182, 42 S. Ct. 489, 66 L. Ed. 888, and in other cases, was the work being done independently of the interstate commerce in which the defendant was engaged, or was it so directly or closely related thereto as to be a part of it? As was said in the last-cited case, there is no precise rule, one that enables an instant and undisputed application, and if it were possible to declare a standard invariable by circumstances or free from confusion by them in application, none such has been declared. In *N. Y. Central R. R. Co.* v. *Carr*, 238 U. S. 260, 35 S. Ct. 780, 59 L. Ed. 1298, the court said that each case must be decided in the light of the particular facts with a view of determining whether at the time of the injury the employee is engaged in interstate business or in an act which is so directly and immediately connected with such business as substantially to form a part or a necessary incident thereof. Of necessity, each case, to a large extent, must depend upon its own facts. It would be difficult if not quite impossible to declare a precise and a universal rule applicable to and controlling in all cases. The best that can be done is the declaration of a general rule as has repeatedly been done. But in the application of it, courts, both federal and state, in dealing with particular and specific instances, have expressed divergent views and as to some of them reached irreconcilable conclusions. While most courts agree that the act requires a liberal construction, yet some of the divergent views may be attributed to a strict construction in one and a liberal construction in another instance.

Copious citations of cases of both federal and state courts are made by each party in his brief. Most of them are collated and noted in 10 A. L. R. 1184, 14 A. L. R. 732, and referred to in 1 Roberts, Federal Liability of Carriers, chap. XXV. A review of all of the cited cases

is impracticable, and to harmonize or differentiate them quite difficult, if not impossible. From what we regard to be the weight of judicial authority, the rule may be deduced that an employee engaged in a railroad yard switching or putting cars, whether intrastate or interstate, out of or into an interstate train or trains, or moving or switching an intrastate car or cars as an incident to or for the purpose of moving or switching an interstate car or cars, in connection with or in furtherance of interstate traffic, is engaged in interstate commerce, or in work so directly or closely related thereto as to be a part of it. In 1 Roberts, supra, at section 500, the author says that the federal act governs the liability of railroad companies to employees injured while breaking or making up trains containing interstate traffic in railroad yards; for the transportation in interstate commerce includes switching movements as well as main line traffic. At section 501 he says whether an employee engaged in setting out a car containing intrastate shipments or picking up a car containing such shipments from or into, as the case may be, a train containing interstate traffic while such cars are detached from the train, is employed in interstate commerce, was a question which gave the courts considerable difficulty in solving and resulted in conflicting rulings prior to the decision in the case of *N. Y. Central R. R. Co.* v. *Carr,* supra. In connection therewith reference is made by him to the cases of *Ill. Cent. R. R. Co.* v. *Behrens,* 233 U. S. 473, 34 S. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163, *Van Brimmer* v. *T. & P. Ry. Co.* (C. C.) 190 F. 394, and other cases. Then, in section 502, he says:

"But the doubt and uncertainty arising from the conflicting opinions of the courts discussed in the foregoing paragraph as to the interstate status of train employees 'picking up' or 'setting out' cars containing intrastate commerce from interstate trains, was removed by the controlling opinion of the national supreme court in *N. Y. Central R. R. Co.* v. *Carr,* 238 U. S. 260, 35 S. Ct. 780, 59 L. Ed. 1298, in holding that a brakeman, while cutting out an intrastate car from an interstate train was under federal control."

In section 505, the author further says:

"Notwithstanding the rulings in the cases discussed in the foregoing paragraphs, there may be situations and circumstances where employees injured while assisting exclusively in the movement of intrastate cars are within the federal act; for, if such employment is but a part of a larger task in interstate commerce, or is a necessary preparatory movement in aid of interstate transportation, then the national statute applies to employees so engaged."

In support of such views cases from both federal and state courts are considered and cited. Among them are the cases of *N. C. R. R.* v. *Zachary*, 232 U. S. 248, 34 S. Ct. 305, 58 L. Ed. 591, Ann. Cas. 1914C, 159; *Penna. Co.* v. *Donat*, 239 U. S. 50, 36 S. Ct. 4, 60 L. Ed. 139; *Louisville & N. R. R. Co.* v. *Parker*, 242 U. S. 13 S. Ct. 4, 61 L. Ed. 119; *B. & O. S. W. R. R. Co.* v. *Burtch*, 263 U. S. 540, 44 S. Ct. 165, 68 L. Ed. 433; *Davis* v. *Dowling* (C. C. A.) 284 F. 670; *Reap* v. *Hines* (C. C. A.) 273 F. 88; *Van Brimmer* v. *T. & P. R. R. Co.* (C. C.) 190 F. 394; *Dennison* v. *Payne* (C. C. A.) 293 F. 333; *Pittsburgh, C. & St. L. R. R. Co.* v. *Glinn* (C. C. A.) 219 F. 148; *Penna. R. Co.* v. *Morrison* (C. C. A.) 3 F. (2d) 986; *B. & O. R. R. Co.* v. *Darling* (C. C. A.) 3 F. (2d) 987; *Bolch* v. *C., M. & St. P. R. R. Co.*, 90 Wash. 47, 155 P. 422; *Barker* v. *K. C., M. & O. Ry. Co.*, 88 Kan. 767, 129 P. 1151, 43 L. R. A. (N. S.) 1121; *Probus* v. *Ill. Cent. R. R. Co.*, 181 Ky. 7, 203 S. W. 862; *Morrison* v. *C., M. & St. P. R. R. Co.*, 103 Wash. 650, 175 P. 325; *Midway Nat. Bank & Trust Co.* v. *Davis*, 288 Mo. 563, 233 S. W. 406; *Sullivan* v. *B. & O. R. R. Co.*, 272 Pa. 429, 116 A. 369. While the facts in these cases are not in all respects identical with the facts of the case in hand, yet the views expressed and the conclusions therein reached are, as we think, here applicable. True, the plaintiff and his crew were not, at the very time of his injury, actually engaged in putting a car in an interstate train to be moved and carried out by it or actually taking a car out of such a train. What they were then doing, though in a sense a degree removed from putting a car into or taking one out of such a train, yet was in furtherance thereof, making up

a fill or a string of cars to be directly put in a particular interstate train. Had the plaintiff and his crew, at the very time of the injury, been engaged in switching cars, whether intrastate or interstate, into or out of an interstate train, they, according to the authorities, at least the weight of them, would have been engaged in interstate commerce or at work so directly related thereto as to be a part of it. And if that be true, it would seem that the switching of cars making up a fill to be directly put in a particular interstate train is incidental and preparatory to and a part of an act or work of putting cars in an interstate train, and thus so closely and directly related to intertsate commerce as to be a part of it. There is evidence to show that the very purpose of the movement of the water car, making it a part of the fill, was preparatory to making up train 256 and to enable that train to pick it up without dalay, thus affecting and facilitating the movement and operation of such interstate train and thereby tended to promote interstate traffic and was so interwoven with it as to be a part of it.

Thus, looking at the evidence most favorable to the plaintiff, the work of the crew placing the water tank car in the fill for the purpose heretofore indicated may properly be regarded, not as a separate and independent task, but as one in connection and interwoven with that of switching and placing the oil tank car and other interstate cars on track No. 1 as a fill. It certainly would lead to great confusion if, when switching the oil tank car out of the fruit block train and on track No. 1 as a part of the fill to be directly put in another interstate train, the crew would be regarded as engaged in interstate commerce, but when switching the water car, an intrastate car, on the same track and for the same purpose and as a part of the same work, the crew should be regarded as engaged only in intrastate commerce.

The respondent, in support of its contention, most strongly relies on the case of *Illinois Central R. R.* v. *Behrens*, supra. There a switching crew in a yard had been engaged

in switching and handling an interstate train. Finishing that work, the crew next proceeded in moving another train made up exclusively of intrastate cars loaded with intrastate freight from one point in New Orleans to another. It was while moving such intrastate train that a member of the crew was injured. It was held that he, at the time of the injury, was engaged in intrastate and not interstate commerce. But there the handling and moving of the two trains were separate and single tasks. The handling or moving of the one had not anything to do with the handling or movement of the other. Nor had the movement of the intrastate train loaded with intrastate freight anything to do with any interstate train or traffic. Nor were any of the loaded cars of the intrastate train to become a part of any particular or of any interstate train. Such cars were not moved for any such purpose, and hence the movement of them bore no relation, either directly or indirectly, to interstate business or commerce. Had the crew here finished or completed its task of making up the fill for a particular interstate train, and then as a separate and independant task had merely moved or switched the water car from one point in the yard to another and not to make it a part of the fill and with no object or purpose of preparing it for or to be taken out by any particular or any interstate train, such a situation would be analogous to and controlled by the Behrens Case. Many other cases are cited by the respondent, but in the main we do not regard them either as being the weight of authority, or as controlling or applicable to the particular facts in hand when viewed in the light most favorable to the appellant.

Respondent's contention that the plaintiff, at the time of the injury, was not engaged in interstate commerce, is largely based on a situation deduced by it from the evidence that track No. 1 was not a fill but a sluff track; that the cars switched on that track were not placed there with the object or purpose that they should go out at any particular time or by any particular train and were just as

likely to be taken out by an intrastate train made up in the yard as by an interstate train; and that switching the oil tank car and other cars out of the fruit block train and switching cars in such train were acts or work independent of and separate from switching the water car on track No. 1, and that the one bore no relation to nor had any connection with the other. Let it be assumed that on the record there is evidence to justify such a conclusion. On the other hand, there is evidence, as heretofore indicated, to justify a contrary conclusion. Hence, as to that, the question became one of fact for the jury.

The point also is made that since train 256, when it came along, carried four loaded cars of livestock, the water car, though it had not been injured, would not have been taken out by that train. But in considering the character of the movement of the water car, the purpose for which it was being moved at the time of the injury, and the place to which it was being moved are of greater importance; for, if the movement switching the water car under orders of the defendant to track No. 1 with other cars to make up a fill for and as a part of an interstate train and to be directly picked up and to become a part of it constituted work so closely related to interstate commerce as to be a part of it, such character of work is not affected because after its performance the order in some particulars may have been countermanded or modified, or because of some contingency thereafter arising such particular train did not carry out the water car. That the water car would not have been carried out by train 256 because it had four loaded cars of livestock, of course, had a bearing on the question of whether the water car was intended to be carried out by that train or by some other train. But if the water car, under orders of defendant, was so switched and prepared to be directly carried out by train 256 and to become a part of it, then, if after such work was done the order was modified, or because of some contingency arising thereafter the water car was not taken out by such train, such modification or

contingency would not affect the character or purpose of the work so performed by the crew.

From these considerations it follows that on the record the question of whether the plaintiff at the time of his injury was or was not engaged in interstate commerce was dependent upon the purpose for which the water tank car was moved and switched on track No. 1, and whether it was so being moved to be directly taken out by and to become a part of an interstate train, concerning which the evidence is in conflict, and thus became one of fact for the jury; and hence the court erred in the ruling.

We, on the record as now before us, hold against the contention of the appellant that, inasmuch as the water car was used to supply water to workmen preparing and maintaining the defendant's track used in interstate ■ commerce, the movement of the water car to supply such men with water directly related to such work, and thus was so closely related to interstate commerce as to be a part of it, as being too remote.

The claim that an employee, engaged in controlling the movement of a car on a yard track to prevent it from coming in collision with interstate cars of a train then being made up, is engaged in work so closely related ■ to interstate commerce as to become a part of it, is worthy of more consideration. *Baltimore & O. R. R. Co.* v. *Darling* (C. C. A.) 3 F. (2d) 987. The doctrine on sufficient facts to support it may be conceded; but we are of the opinion that on the record the evidence respecting the subject is too meager, and the facts concerning it not sufficiently developed, to have entitled the plaintiff to go to the jury on such theory.

For the reasons and on the ground heretofore stated, the judgment of the court below is reversed, and the cause remanded for a new trial. Costs to appellant.

THURMAN, C. J., and CHERRY and HANSEN, JJ., concur.

GIDEON, J., dissents.