## UHR v. EATON.

No. 5958.   Decided July 8, 1938.   (80 P. 2d 925.)

*Chas. D. Moore,* of Salt Lake City, and *George W. Worthen,* of Provo, for appellant.

*Brockbank & Pope,* of Provo, for respondent.

JONES, District Judge.

This is an appeal from judgments directing a verdict adverse to appellant (plaintiff) as to the first and second causes of action and granting a non-suit as to the third and fourth causes, set forth in the complaint. The first cause was for false and defamatory statements contained in a criminal complaint; the second for malicious prosecution; the third for false and defamatory statements made verbally to the arresting officers; and the fourth for false imprisonment. By reason of the nature of the assignments of error and argument thereon, it becomes necessary to make a rather detailed statement of the facts involved.

Both parties had been employed for several years as railway telegraphers at Kyune, Spanish Fork Canyon, Utah County, on the main line of the Denver & Rio Grande Rail-

way. This station is situated off the highway, and the total population consists of the three "trick" operators, the section foreman, and several laborers, all employees of the railroad. Plaintiff and defendant had been good friends for some years, but commencing about 1933 a mutual dislike had arisen which seemed to ripen into hatred. She had stored some things in his garage during the friendly period but had neglected to remove same when the trouble commenced and appellant was taken into custody. Three shifts were maintained at the railway office, appellant worked from midnight to eight, respondent then took over until four in the afternoon when the third operator took over until twelve. She lived about one thousand feet east of the Station in a small frame structure, while he maintained his abode alone in a box car which joined onto the station proper. Her husband was a telegrapher not regularly employed on the same railroad, being classified as on the "extra board" or awaiting both temporary and permanent employment whenever for any reason a regular operator was off the job. The first untoward incident between the parties that sheds any direct light on the issues to be determined occurred about the 28th of August, 1935, shortly after respondent had relieved appellant at the depot for her regular shift. She watched him walk towards her home, where at a point near the corner fence he motioned his arm as if throwing something in her yard, and then walked on. He denies ever throwing anything in her yard or swinging his arm as she says. At any rate, when the next train had cleared the station she walked over near where the swinging of the arm had allegedly taken place where she discovered a small piece of bacon wrapped in wax paper, evidently intended for her dog. This she took back to her place of work where she exhibited same to her husband, (who was staying at home at that time and unemployed) and to the third operator. It was there determined that the meat might be poisoned, and that the same should be sent to the State Chemist for examination. So she wrapped up the meat, addressed the package, and her hus-

band forwarded it from Soldier Summit that afternoon. Her letter, after reciting that the address was a certain post-office box at Helper (a few miles eastward from Kyune), requested an analysis of the bacon, and further set forth that respondent was the owner of a valuable St. Bernard dog, and that she wondered if the meat could contain poison intended for the dog. Then on August 31st, in answer to a letter from the chemist to the effect that the analysis would have to be handled as a private matter, respondent wrote back that she would take care of the expenses, saying, "I figured it would be around $5.00 as I do not believe it was a prescription order. It is the second suspicious package I have found and as it was thrown into the yard where small children come and play with the dog, (the record is silent, otherwise, as to their being small children at Kyune) I felt I should ascertain the exact nature of the stuff." On September 4th, not having heard from the chemist, respondent wrote him again advising that if poison be found that the wrapping paper should be kept as "we want to have finger prints made off of it." That about this time respondent approached one who had been at Kyune on the morning of August 28th, and stated that if he would say that he saw appellant throw the package in her yard that he could make a good witness for her. (This statement was stricken out by the Court, we think erroneously). On September 6th the chemist wrote back advising that none of the common poisons had been found in the bacon, that a more detailed analysis was impracticable due to the limited amount of material submitted. On receipt of this negative report respondent wrote back to the chemist stating that she "told you in my letter which accompanied the package that the substance was in the center of the piece of bacon. I slit had been made in the larger and fat end and a capsule inserted into this opening, it was very distinct, and I and others saw it, that it is what I wanted analyzed and not the meat itself. Please look into the bacon piece and take out this substance and advise me what it is—this capsule is just about the cen-

ter of the bacon, and entirely inside of same, it is very plain. I would not have been suspicious of just the piece of bacon if I and others had not seen the substance in the capsule." The chemist then re-examined the bacon, located the capsule at the place indicated, and on September 9th advised respondent that in the center of the bacon was found a kernel of white compressed powdery substance about the size of a pea which contained an appreciable quantity of strychnine.

Respondent's husband having been called into Colorado to work a few days on the R. R., respondent was awakened during the night of September 12th by the growling of her dog, and upon arising saw appellant on her back porch (he was on shift at the time) with his left hand elevated near the summer cooler where her food was kept. That appellant then turned and walked out of the door throwing one hand out as if tossing something on the yard, and then vanished in the darkness. Appellant denies being on the porch or near the cupboard at any time. After daylight respondent went out in her yard where she discovered a piece of fresh beef wrapped in oiled paper. This she took into the home and upon unwrapping same located a row of white tablets, fourteen in number, embedded in the meat. She then made up sandwiches from food taken from the summer cooler for her lunch and went over to relieve appellant at eight A. M., taking also the meat found in the yard that morning and a pair of rubber gloves to be used when exhibiting this meat. She first showed the meat to the third operator and then called Mr. Sage, a Western Union lineman located at Helper, told him what had happened (he, as a close family friend, already knew about the so-called bacon episode). Respondent then talked with the train-master requesting that some action be taken at once, but he replied that he could not come until later on during the day. Respondent told another railroad worker that morning that appellant "would not work no more for the railroad company," and repeated that statement several times both before and after the arrest of appellant. Respondent subsequently went home for lunch

and then returned. Mr. Sage arrived from the east on his speeder during the afternoon, and accompanied respondent to her home, the two bringing with them the meat found by respondent that morning, the rubber gloves, and the sandwiches which she had not eaten. On arrival he built the fire and began assisting in the preparation of the evening meal. In doing so, he brought a piece of butter out of the summer cooler which on examination was found to contain the same kind of white substance as was discovered in the meat that morning. Mr. Sage stayed at the home until about the time the trainmaster arrived at the depot, when he departed. Respondent then started walking toward the station to meet the railroad official, but on seeing him coming toward her home with another, she retraced her steps. That either at this time or shortly prior thereto, just as the train carrying the trainmaster was approaching Kyune, respondent fed her dog the sandwiches made that morning. She then told her story to the two railway men, exhibiting the report of the State Chemist, showing the presence of strychnine in the bacon, showed the meat and butter with the white tablets therein to them, but before she could conclude, the pet dog stiffened up in the presence of these men and died, whereupon respondent fainted. The trainmaster immediately arranged by wire for respondent's husband to come to Kyune on account of her illness, and leaving his subordinate there to care for respondent until her husband arrived, he departed intent on notifying the proper peace officers of Utah County of the facts. Mr. Eaton arrived at Kyune at 4 A. M. next morning, and respondent worked her regular shift commencing at eight A. M. A deputy sheriff and a railroad special agent arrived from the west that morning, and after hearing respondent's story, and viewing the exhibits, including the comparison of the similarity in the appearance of the meat with another piece found at appellant's home, arrested him and took him to jail at Provo. Respondent's husband worked appellant's shift that night (he was next in line on the extra board for work) and continued to so

work during the several days Uhr remained in custody and during the preliminary hearing. In the meantime the butter and meat in question was sent into the State Chemist, who, on analysis, determined that these foods, like the bacon previously sent in, contained strychnine in harmful quantities. On the 16th of September, respondent, after consulting the county attorney, during which interview the facts herein were substantially related from her viewpoint and on the advice of said prosecutor she signed a criminal complaint before a magistrate at Provo charging appellant with the felony of having placed strychnine in certain butter and meat belonging to respondent, with the intention on his part that complainant should eat the same to her injury. Thereafter a preliminary hearing was conducted, during which appellant asserted his innocence of any wrong-doing, as the result of which Uhr was subsequently discharged by the magistrate, because "the offense was not committed and not sufficient cause shown to believe the defendant guilty." Appellant then commenced the present action. An answer was filed, which, after denying the material allegations of the complaint, alleged that a disclosure had been made to the county attorney as to the facts, who, after making an investigation thereon, advised and requested respondent to sign the criminal complaint; that she did so by reason of said advice solely and was never at any time actuated in said doings by any malice whatsoever, but that all things said and done were for the sole purpose of aiding justice with an honest belief on her part that all such facts were true. By reply, appellant denied the affirmative matter set forth in the answer. The case then came on for trial, from which it appears that respondent had testified to facts substantially the same as theretofore outlined to the county attorney and that said official had thereupon requested respondent to sign the complaint in question. As before stated, the Court refused to let the jury pass on the issues of fact and granted a directed verdict because of lack of facts sufficient to justify a submission to the jury of any malice on respondent's

part, or not sufficient evidence in the record to show a want of probable cause on Mrs. Eaton's part in doing what she did so as to justify the submission of that issue to the jury. Also because it affirmatively appeared that respondent had fully, fairly and truthfully stated all the facts and circumstances in relation to the alleged crime to the county attorney, and had thereafter acted solely on his advice and counsel in doing what had been done.

Turning now to the question as to whether a sufficient showing of lack of probable cause was made so as to require the submission of this issue to a jury, we are confronted with a rule of law that it is the duty of a complainant to make a full, fair and complete disclosure of the facts within his knowledge to the public prosecutor, and also all facts which he had reasonable ground to believe existed at the time of making the statement, or all facts which he could have ascertained by reasonable diligence, and that, having done so, he can successfully defend, by reason of such disclosure and the acting on the advice received thereon, any malicious prosecution action brought against him. *Sweatman* v. *Linton,* 66 Utah 208, 241 P. 309; *Thomas* v. *Frost,* 83 Utah 207, 27 P. 2d 459.

Respondent maintains that because the record affirmatively shows, which it does, that she testified substantially to the same facts at the preliminary hearing as she had theretofore told the county attorney prior to the issuance of the criminal complaint, that she must be classified as having made a full, fair and truthful disclosure in accordance with the rule, and therefore justly entitled to the directed verdict rendered. In the light of other facts in the record, however, taken in their most favorable light, which we are required to do in determining this question, we cannot say that respondent is entitled to the protective cloak of this rule. *Roach* v. *Los Angeles & S. L. R. R.,* 69 Utah 530, 256 P. 1061. Appellant contends that the respondent made up the story which she told the County At-

torney and on which she relied for the conviction, and that such statements were false. Can it be said that one who concocts or "frames" another by going to the county attorney relating false statements, which appear plausible enough at the time, and thereby obtains the arrest of an innocent man, can thereafter successfully prevent a malicious prosecution action from being submitted to a jury by merely showing that her testimony at the preliminary hearing before a magistrate was substantially the same as related by her originally to the public prosecutor in the face of facts which tend to show that the whole story was untrue? We think not. The very essence of the rule is that the disclosures to the prosecutor must be truthful, and when evidence is introduced in a damage action, as here, by the aggrieved party tending to show that the county attorney unbeknowingly acted on deliberate falsehoods, presented by the complainant, then this rule should not be used to prevent the triers of the facts from passing on the ultimate issues.

The cases cited by respondent uphold and are not contrary to this doctrine:

"*Brown* v. *St. Louis R. R. Co.*, 158 Okl. 31, 12 P. 2d 528; *Christiansen* v. *Anderson*, 179 Wash. 368, 37 P. 2d 889; *Hightower* v. *Union Savings & Trust Co.*, 88 Wash. 179, 152 P. 1015, Ann. Cas. 1918A, 489; *Gordon* v. *Mount*, 125 Cal. App. 701, 13 P. 2d 932; *Moore* v. *Durrer*, 127 Cal. App. 759, 16 P. 2d 676; *Huf et ux.* v. *Hague et ux.*, 171 Wash. 302, 17 P. 2d 844; *Carr* v. *Zellerbach Paper Co.*, 169 Wash. 493, 14 P. 2d 35; *Richter* v. *Neilson*, 11 Cal. App. 2d 503, 54 P. 2d 54; *McAfee* v. *Los Angeles Gas & Electric Corp.*, 215 Cal. 219, 9 P. 2d 212; *Jirku* v. *Brod*, 42 Cal. App. 796, 184 P. 413; *Pacific Nat'l Co.* v. *Southwest Finance Co. of California*, 4 Cal. App. 2d 326, 40 P. 2d 862; *El Reno Gas & Electric Co.* v. *Spurgeon*, 30 Okl. 88, 118 P. 397; *Henning* v. *Miller*, 44 Wyo. 114, 8 P. 2d 825, 14 P. 2d 437; *Sims* v. *Jay*, 53 Okl. 183, 155 P. 615, and *Putnam* v. *Stalker*, 50 Or. 210, 91 P. 363."

We accordingly hold, on the record before us, that there appears such a substantial conflict of evidence regarding the necessary elements of probable cause as to require the submission of this issue to a jury. In doing so, however, we do

not relax the time-honored rule that a truthful and full disclosure of the facts to a prosecutor constitutes a complete defense to an action of this kind.

We feel that there was a sufficient showing of malice to require submission to a jury. In certain cases the facts from which lack of probable cause may be inferred may also give rise to the inference of malice. *Ward* v. *United Groc. Co.*, 84 Utah 437, 36 P. 2d 99. But there appears affirmatively here independent acts and words on ■ the part of respondent, which, if given credence, tend to substantiate appellant's theory. The statement of one witness that respondent told him before any arresting officer arrived that appellant would never work for the company again, and also, that Mrs. Eaton had made statements about the plaintiff indicating ill will toward him; respondent's statement that if the witness would say that he saw appellant throw a package in her yard, he would make a good witness for her, and finally, the statement of respondent in reply to a suggestion that she tell Uhr that she saw him throw the bacon in the yard, "No, no I was afraid to. He is a dangerous snooping character", would appear to be sufficient, under all the facts and circumstances, to justify the submission of the question of malice to the jury.

Having determined that there appears a sufficient conflict in the evidence as to both the lack of probable cause and malice so as to require the submission to the jury of these issues, we find that we have also disposed of the defense of a truthful disclosure to the prosecutor to the extent of holding that there appears contradictions in the record on this matter which, under our system of law, should be submitted to the jury. It follows that appellant is entitled to a new trial as to his first and second causes of action on which a separate judgment of dismissal was entered by the court.

As to the third and fourth causes of action, wherein a judgment of non-suit was entered, we do not feel disposed

to examine the record for the reason that while assignments of error were made, yet no argument was made thereon either in the printed briefs or at the time of oral presentation, as required under our practice. *Parry* v. *Harris,* 93 Utah 317, 72 P. 2d 1044.

So far as the retrial of the issues on the first and second causes of action are concerned, we also desire to make plain the proposition that a defendant in an action of this kind is entitled to offer testimony under the so-called "full disclosure" doctrine on the general issue. In other words the general denial interposed by respondent here to the complaint made a sufficient issue of fact so as to entitle her, on the present record, to have submitted to the jury the question of whether she did, in fact, fairly, fully, and truthfully disclose all of the facts to the prosecutor as she claims. The mere fact that the so-called affirmative defense only pleaded that respondent "appeared before the county attorney with respect to and concerning the matters and things alleged in the complaint" without alleging, in substance, that the facts stated were fairly, fully, and truthfully given does not prevent the offering of such testimony under the general issue. See 38 C. J. 472 and cases there cited.

The judgment entered on the directed verdict is reversed and a new trial granted thereon. The judgment entered on the non-suit not having been properly attacked, is affirmed. Appellant to recover costs.

FOLLAND, C. J., and HANSON, MOFFAT, and WOLFE, JJ., concur.

LARSON, J., being disqualified, did not participate herein.