## ROACH v. LOS ANGELES & S. L. R. CO.

No. 4770.   Decided April 9, 1929.   (180 P. 1053.)
Rehearing Denied October 1, 1929.

See, also, 69 U. 530; 256 P. 1061.

*George H. Smith, J. V. Lyle, R. B. Porter,* and *W. Hal. Farr,* all of Salt Lake City, for appellant.

*Willard Hanson* and *A. H. Hougaard,* both of Salt Lake City, for respondent.

STRAUP, J.

The plaintiff brought this action under the Federal Employers' Liability Act (45 USCA §§ 51-59) to recover damages for personal injuries alleged to have been sustained by him in the employ of the defendant. It is admitted that the defendant was a railroad common carrier engaged in interstate commerce, and that the plaintiff was in its employ as a switchman in the yards of the defendant at Lynndyl, Utah, where the injury occurred in making a flying switch. It is alleged that, in making a flying switch of a car, a water tank car, it was the duty of the plaintiff to disconnect the car from the switch engine and then board it, to control and arrest its speed; that the engineer operating the switch engine with the car attached operated them at a negligent and excessive speed, at 20 miles an hour, failed to decrease the speed, and slow down on signals given him so to do by the plaintiff and by others, so that a reasonably safe opportunity or means to disconnect the car from the engine, or to board it after it was disconnected, to arrest its speed, was not afforded him, and while attempting to board it he was injured.

It was further alleged that, when the car was detached from the engine and about to enter the track on which it was to be switched, it was going at such speed that, unless arrested or the car stopped, there was "great and imminent danger" of causing "great and irreparable loss and damage to the property of the defendant," by the car colliding with other cars on the track, and that there was "great and imminent danger" that employees of the defendant about the yard and cars "would be greatly injured and perhaps killed

by said collision," and the plaintiff, believing that the safety of other employees and great loss of property were imperiled if the speed of the car was not arrested and stopped, and that he could board the car and arrest its movement without injury to himself, attempted to do so.

The defendant denied the alleged negligence, the alleged peril, and that the plaintiff at the time of injury was engaged in interstate commerce, and alleged he was engaged in local or intrastate commerce, that he was himself guilty of negligence, which was the sole proximate cause of the injury, and that he assumed the risk.

The case was here on a former appeal. On the first trial, at the conclusion of all the evidence, the defendant interposed a motion to direct a verdict in its favor, on the grounds that the plaintiff at the time of the injury was not engaged in interstate commerce, insufficiency of evidence to show negligence on the part of the defendant, and that the evidence affirmatively showed that the negligence of the plaintiff was the sole proximate cause of the injury, and that he assumed the risk. The court granted the motion, but on the sole ground that the plaintiff was not engaged in interstate commerce. From a judgment of no cause of action, entered on the verdict, the plaintiff appealed.

The sole question presented on the appeal was whether the plaintiff was engaged in interstate commerce. Both parties by their briefs and arguments asserted that such was the only question presented and to be considered and determined. No attempt was made by the defendant, by assignment, brief, argument or otherwise, to defend the judgment or the ruling directing the verdict on any of the other grounds stated in the motion. Both parties presented, briefed, and argued the case on the theory that, if the court erred in directing the verdict on the ground on which it was directed, such ruling required a reversal of the judgment and remanding of the case. On a review of the record we thus considered but the one question so presented. In doing so we reached the conclusion that the evidence as to the character of the

work performed by the plaintiff at the time of the injury was in conflict, and hence the question of whether the plaintiff was or was not engaged in interstate commerce required a submission of it to the jury on proper instructions. We thus reversed the judgment and remanded the case for a new trial. 69 U. 530; 256 P. 1061. There may be found a statement of the evidence as to the character of the work performed by the plaintiff and the conflict in the evidence in such particular.

In accordance with the remittitur, the case was retried to another jury. At the conclusion of the evidence, the defendant again interposed a motion for a directed verdict, on all of the grounds stated in the motion on the first trial. The motion was overruled, and the case submitted to the jury, with instructions that, if they found the facts as shown by the evidence on behalf of the plaintiff, he was engaged in interstate commerce, but if the facts were not so found, or if found as shown by the evidence on behalf of the defendant, the plaintiff was not engaged in interstate commerce, and could not recover, regardless of all other issues. The court, however, also submitted to the jury all of the other issues, the charged negligence of the defendant, and the questions of contributory negligence and of assumption of risk. The jury rendered a verdict finding the issues in favor of the plaintiff and against the defendant, assessing his total damage in the sum of $15,000, but reduced it by $5,000 on the ground of contributory negligence, and thus fixed the amount of the verdict at $10,000, for which amount judgment was entered in favor of the plaintiff, from which the defendant has prosecuted this appeal.

By the filed assignments numerous errors are assigned: Overruling the motion to direct the verdict on all of the grounds stated in the motion; alleged errors respecting the charge in several particulars, and in refusing to charge as requested by the defendant; insufficiency of the evidence to support the verdict, specifying in such particular that the evidence was insufficient to show

negligence on the part of the defendant, or to show that plaintiff was engaged in interstate commerce; that he was guilty of negligence which was the sole proximate cause of the injury, and that he assumed the risk. But in its brief and in argument the defendant presents for our review and determination but two questions: Whether on the undisputed evidence the plaintiff as matter of law was or was not engaged in interstate commerce; and whether he had or had not assumed the risk. Both parties, by their briefs and arguments, assert such to be the only questions presented for review and determination on this appeal. Not anything is presented or argued with respect to any of the other filed assignments. It is well settled in this jurisdiction that questions not assigned, or though assigned, but not briefed or discussed, will not be considered. *Jensen* v. *Utah Railway Co.* (Utah) 270 P. 349. We thus on this review are restricted to the two questions so presented and argued.

As to the question of whether the plaintiff was or was not engaged in interstate commerce, it is not contended that the evidence on the second trial was different from that on the first trial. Not anything in such particular is claimed, or pointed out, or urged. As appears by the opinion on the first appeal, Lynndyl is a division point. The defendant maintains two lines of railroad from Salt Lake City to Lynndyl; one, called the main line, running through Garfield and other points west of the Oquirrh Mountains, and the other to the east of them, through Provo and other points. From Lynndyl toward Nevada and California points, there is but one track or main line. At Lynndyl trains are broken up and cars switched in and out of them. The crew of which the plaintiff was a switchman was one of the crews doing that work. It switched all kinds of cars, interstate and intrastate, empty and loaded, took interstate and intrastate cars out of and put them in interstate and intrastate trains, and made up trains as the business and traffic required.

The plaintiff's shift was from 11 p. m. until 7 a. m. the

next morning, and on the day in question his crew did that kind of work. Among other cars so switched was an oil tank car carrying interstate shipments, which with other cars was switched out of an interstate train arriving at Lynndyl at 3:10 a. m., and departing at 4:30 a. m., and switched on track No. 1 to be carried out, as contended by the plaintiff, by an interstate train called No. 256, a daylight freight train coming from points in California and Nevada to Lynndyl, and thence on to Salt Lake City, carrying interstate shipments, and arriving daily at Lynndyl from the west between 8 a. m. and 12 o'clock noon. Train No. 256 usually was what is called a "dead freight train." On the shift of plaintiff's crew an order was received at Lynndyl by the defendant's agent to fill the water tank car to be carried out on the defendant's main line towards Salt Lake City, by the first daylight dead freight train, to supply section men with water working on the defendant's main line. The order was communicated to the foreman of plaintiff's crew a short time before the crew went off duty at 7 o'clock a. m. The water tank car was not itself an interstate car. It was operated wholly within the state, to carry water used within the state. In obedience to the order the water tank car was switched to the water tank, where it was filled with water by the plaintiff. Orders were then given by the foreman to switch it on track No. 1, next to the oil tank car. So far, there is no substantial dispute in the evidence.

There is a dispute as to the character of track No. 1, the purpose for which it was maintained and used, and as to what train was to carry out the filled water tank car. Track No. 1 is a track next to the main line, parallel to and by means of switches connected with it. It is the contention of the plaintiff, and there is evidence tending to show, that track No. 1 was what is called "a fill," which consisted of cars switched on that track from other tracks and trains, and placed thereon to be taken out by trains coming along, and that the water tank car, by orders of the foreman, was

switched on track No. 1, to be taken out with other cars on that track, including the oil tank car, by the first daylight dead freight train, which, as the plaintiff contended, was train No. 256, an interstate train, and that the oil tank car, the water tank car, and other cars were so placed on track No. 1 to enable the crew of train No. 256, when it came along, to readily connect with them and carry them out easterly on the main line. Train No. 256 was expected along any time after 8 o'clock a. m. The switching of the water tank car on track No. 1 was about 6:45 a. m., about 15 minutes before the end of plaintiff's shift. The oil tank and other cars were switched on that track prior thereto. The next switching crew did not go on shift until 3 p. m. There thus was no switching crew to do any switching when train No. 256 arrived after 8 a. m. The contention of the plaintiff thus was that switching the oil tank car, the water tank car, and other cars on track No. 1 was to enable the crew of train No. 256, an interstate train, to readily connect with them without delay and without unnecessary switching by the crew of that train, and thereby to facilitate and aid the interstate transportation carried on by train No. 256.

Some of these propositions were disputed by the defendant. It was not disputed that train No. 256 was an interstate and generally a dead freight train, nor that it was the first daylight dead freight train expected to come along after the water tank car and other cars had been switched on track No. 1. But the defendant disputed the character of track No. 1 as described by the plaintiff. It contended that that track was not "a fill," but "a sluff track," a track on which to store cars until such time as they might be moved without knowing, when placed on the track, when they would be moved, or what train would move or carry them out, and that, as a matter of fact, train No. 256, when it arrived at Lynndyl on the day in question, was not, as it generally was, a "dead freight train," because it on that occasion carried four carloads of live stock, and though the

water tank car, in switching it, had not been injured as it was by colliding with other cars on track No. 1, it, nevertheless, would not have been taken out by train No. 256, and that to have done so would too much have delayed train No. 256 carrying the four carloads of live stock. However, had the water tank car not been injured in switching, and had train No. 256 not carried the live stock, it is not disputed that train No. 256 would have carried out the water tank car as it did on that occasion a number of other cars on track No. 1, including the oil tank car. The water tank car, in switching, was injured to the extent that it required repairs before it could be moved out. When it was repaired, it, two or three days after the accident, was carried out by train No. 256.

The defendant did not on the first appeal, nor does it now, expressly contend or urge that, if the facts were as claimed by plaintiff, he was not engaged in interstate commerce. What it chiefly contended and urged was that the evidence, when fairly considered, did not justify the claim of the plaintiff that track No. 1 was of the character described by him, that the water tank car was switched on that track for the purpose as claimed by him to be directly carried out by train No. 256, or to facilitate or aid the movements of that train in carrying interstate shipments, or otherwise to facilitate or aid interstate commerce. But on the first appeal we in effect held that the defendant, for the purpose of its motion to direct the verdict, was required to assume the facts from a viewpoint of the evidence and the inferences to be deduced therefrom most favorable to the plaintiff. So viewing the record, we held the defendant was not entitled to a directed verdict, on the ground that on the undisputed evidence the plaintiff was not engaged in interstate commerce. The case on the first appeal was elaborately briefed by both parties. We recognized then, as we do now, that to bring himself within the provisions of the act the plaintiff was required to show that the work at which he was engaged at the time of the injury was so directly or closely

related to interstate commerce engaged in by the defendant as to be a part of it.  Such general rule is, we believe, of general recognition, yet, on given states of fact or situations, when an employee may be regarded within or without the rule, many divergent judicial views have been expressed, both federal and state, some of which, if not irreconcilable, are most difficult to differentiate or harmonize.  Because facts and circumstances and situations of cases are variable, no prescribed rule, not anything but the general rule, can be declared as a standard by which all cases may be determined.

To support its contention that the plaintiff was not engaged in interstate commerce, the defendant on this appeal cites the cases of *Illinois Cent. R. Co.* v. *Behrens,* 233 U. S. 473, 34 S. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163, *Erie R. Co.* v. *Welsh,* 242 U. S. 303, 37 S. Ct. 116, 61 L. Ed. 319, and *Morrison* v. *Chicago, M. & St. P. R. Co.,* 103 Wash. 650, 175 P. 325, cases among many others cited on the first appeal, and *Shauberger* v. *Erie R. Co.* (C. C. A.) 25 F. (2d) 297, *Mayor* v. *Cent. Vt. Ry. Co.* (D. C.) 26 F. (2d) 905, and *Poindexter* v. *Cleveland, C., C. & St. L. R. Co.,* 319 Mo. 285, 4 S. W. (2d) 1065, cases not cited on the first appeal.  The plaintiff again cites the cases cited on the prior appeal, and five or six additional cases not cited on that appeal.  We have examined the additional cases cited by the defendant.  When carefully read and considered in connection with the particular facts of each case, we think they do not make against or run counter to the views expressed by us on the former appeal, or the authorities cited by us in support thereof.  Should, therefore, what we determine on the prior appeal, that the plaintiff in the light of the evidence most favorable to him was engaged in interstate commerce, be regarded as not the law of the case on this appeal, because what we so determined being not final and subject to review (4 C. J. 1103, 1104), yet, on further consideration of the question, we still are content with the ruling theretofore made by us on that subject.  The trial court thus did not err in submitting the question to the jury.  No claim is made

by the defendant that the trial court did not submit the case in accordance or in harmony with the views expressed by us on the prior appeal. As the charge in such particular or from such viewpoint is not by brief or argument assailed or questioned, reference to the charge is unnecessary, except the observation that the question on proper instructions was submitted to the jury in harmony with the views expressed by us on the prior appeal.

Now, as to the question of assumption of risk: We think that more serious. As heretofore indicated, that question was not presented, considered, or determined on the prior appeal. It by assignment and briefs could have been presented on that appeal, but neither party did so. The general rule, at least we think the weight of judicial authority, is that an appellate court ordinarily will not consider matters assigned as error which arose prior to the first appeal, and which might have been raised thereon, but were not, nor matters appearing in the original record, which might have been presented and ruled on on the first hearing, but were not urged. 4 C. J. 1100, 1101, and cases there cited. There is no doubt that the matter of assumption of risk arose prior to the first appeal, and appeared in the original record on that appeal, and that an assignment of error with respect thereto could have been made and the question reviewed and determined on that appeal, and though it is not claimed that the evidence relating to the question is in any particular different on the record of the second appeal than on the first, yet, inasmuch as the question was not in fact considered or determined on the first appeal, and since it is doubtful whether a determination of the question on the first appeal, had one been made, would be the law of the case on this appeal, even upon the same facts, because the determination would not have been final, and would be subject to review, we have reached the conclusion to now consider it. Besides, the question is presented and briefed by both parties as an original question, without any rule of law of the case with respect thereto invoked or urged.

In considering the question, further reference to the evidence bearing upon it is necessary. The plaintiff's switching crew consisted of a foreman, an engineer, a fireman, and two switchmen, the plaintiff and one Wilkey. The foreman received orders to fill the water tank car, to be taken out by the first daylight dead freight train, which the plaintiff contended was train No. 256, and the defendant, which might be any dead freight train, interstate or local. By orders of the foreman, the water tank car in the yard was moved to the water tank. Plaintiff was directed to fill it while other members of the crew did some other work about the yard. The water tank car, while being filled, was in the yard on the track running east of the Oquirrh Mountains, through Provo and other points, to Salt Lake City. That track, by means of a switch, was connected with track No. 1. Both tracks run northerly and southerly; track No. 1 being south of the other track, and next to and parallel with the main line, with which it also was connected. When the water tank car was filled, orders were given by the foreman of the switching crew to switch it on track No. 1. The switch, which was required to be thrown to run the water tank car on track No. 1, was about 1,150 feet from the water tank. Beyond the switch a short distance was another switch track or lead, called the "inbound roundhouse lead," running in a southeasterly direction. From the switch to the clearance point on track No. 1, on which stood the oil tank car and a number of other cars, was about 480 feet.

In making the flying switch the engine was brought up, and the front end of it coupled on the south end of the water tank car. When the car was thus moved, the engine was operated backward, running in a southerly direction towards the switch. After the engine and car had reached the desired momentum, it was the intention to disconnect the car from the engine, somewhere between the water tank and the switch, the engine then to increase its speed and pull away from the car, and run down the inbound round-

house lead, whereupon the switch was to be thrown, so as to permit the water tank car on its own momentum to run on track No. 1. Wilkey was at the switch, to throw it after the engine had passed it. The plaintiff was to disconnect the water tank car from the engine, and then board it, to arrest its speed and stop it as it reached the clearance point on track No. 1. To disconnect the car the plaintiff stood on the foot platform or running board on the front end of the engine.

The defendant contended that he was negligent in taking such a position; that he ought to have been on the platform on the front end of the car and there throw the lever releasing the connecting pin. It was the contention of the plaintiff that he was required to be on the engine to give signals to the engineer as to speed and slack to make the disconnection, and that he could not do that on the front end of the car, as in such position he was required to be on the side of the car opposite that of the engineer. At this point the conditions as described by the plaintiff and as set forth in the abstract are as follows:

"The first time I gave the engineer the slow signal, I was about 100 yards from the tank. The engineer didn't decrease the speed of the engine in response to the first slow signal. I gave several slow signals, and he didn't respond to any of them. I gave stop signals. I had proceeded about 150 yards toward the switch at the time I gave the first stop signal. He didn't respond to the stop signals. I also gave a washout signal, which means to stop immediately, as soon as possible. The farther down the track he went, the faster the engine was going, and I was holding on with the right hand on the grab-iron, runs clean across the front of the engine, pretty high to reach up to grab it, and the footboard across the front of the engine, 12 inches from the ground, pretty hard to reach up and hold that position of the grab-iron of the engine over head; a little ways I was using the left hand in giving the signals to try to get him to slow down. As I was giving the signals, he was reversing the lever of the engine, giving it quick jerks back and forth, trying to get me to release the pin; that is, he released the pin by reversing his engine, back and forth quick jerks, and each time that he done this he gave a sudden jerk and threw me off balance. I was holding with my right hand and using my left hand to get him to stop. When he gave this sudden jerk,

it threw me around like this, and my left hand was free, and I grabbed to keep from falling off between the engine and the car, and, the way I was standing, the only thing I could get ahold of was the pin lifter that sets pretty close to the stomach, and I could reach it, and while doing that my weight was on the pin lifter, and he gave me slack again, and my weight pulled the pin, and he ran away from the car. I didn't intend to pull the pin at that time. It was pulled by accident and by my endeavor to keep my balance from falling off the footboard of the engine. Yes; he released the engine from the water car. Then Mr. Spidell gave the engine more speed, to run away from the car into the roundhouse lead, into the clear.

"At that time I was on the footboard of the engine. I stood on the footboard until he came to slow speed—until I could get off in safety. He was going pretty fast. I could not say the exact speed, but about 25 to 28 miles an hour, to outrun his car, to have time to give the switchman at the switch time to throw the switch back for the car to do down the main lead. At that time the speed of the engine was quite a bit greater than the speed of the car. I dismounted at the switch; the engine had slowed down considerable at the switch, where the switchman was standing; Mr. Wilkey, if I remember right, was about 10 feet before I got to the switch. At that time the water car come down in a flash, and I stepped on the main track, and as the car came by I grabbed for it. At that moment I believed the speed of the water tank to be 10 or 12 miles an hour. As I viewed it subsequent to the accident, after all this had taken place, and as I now view it, and basing my judgment on those facts, I would say the speed of the water tank on that occasion was 15 to 18 miles an hour. * * *

"I stepped over to the lead, and as the car came by I made a grab for it, and grabbed the grabiron on the end of the car, and it was going at such a rate of speed that I was unable to get my foot in the what is called the stirrup of the car, and it threw me, my foot went from the end, and I was drug by the car, and I hit the rail with my right knee, and injured it; when I hit my knee on the rail, my knees were dragging on the ground. I was holding by both hands on the bottom grabarm of the car, and when I hit this rail my knee, it hurt so bad, it made me sick, and I turned loose of the grabiron and fell to the ground. The speed of the car was too great on that occasion for me to get my feet into the stirrup of the car. I couldn't stand up long enough to get my balance, so I could lift myself and jump and put my foot in the stirrup. If it had been going at a lesser speed than 10 or 12 miles an hour, I could under those circumstances ordinarily have made the grabiron and got my foot in the stirrup."

The plaintiff further testified that one or two other employees were working in the yard, inspecting trains going out and coming in, looking over cars to see if there were defects, coupling up the air hose, replacing brake shoes, etc., and that he had seen one or two men working in the vicinity of track No. 1 about 15 minues before the flying switch was made; that there was a rule of the defendant, which was put in evidence, that "in case of danger to railroad property, employees must unite to protect it"; that his intention was to board and "stop the car, or it would collide with other cars, for the purpose of protecting the company property and other men's lives." On cross-examination he further testified that he was not sure whether there were two men, or but one man, working in the vicinity of track No. 1, and when his attention was called to his testimony at the former trial, that he testified there was but one man workin that vicinity, he answered that he did not remember whether he had so testified or not. He further testified that it was in violation of rules of the company for car inspectors to couple up air hose without putting a blue flag on the train or cars about which the men were at work, and that he did not see any blue flag on any of the cars on track No. 1. He also testified that it was the custom and the practice, in making flying switches, for the engineer to take signals from the man at the switch as to the speed of the engine, and that the engineer had the right to follow such custom when there were two switchmen engaged in disconnecting the car, one on top of the car and one disconnecting the car, but, because the plaintiff was the only switchman doing that work, it then became the duty of the engineer to take signals from him. It further was made to appear that Wilkey, the man at the switch, gave signals to the engineer to slow down and decrease the speed, but the engineer testified he did not see such signals given, as he was looking in the direction of the plaintiff.

The only evidence given by the plaintiff as to the speed of the car when he attempted to board it was his testimony

that he, at the time, thought it was going 10 or 12 miles an hour, but "as I view it subsequent to the accident," and after what had taken place, "and as I now view it and base my judgment on these facts, I would say" the speed was from 15 to 18 miles an hour. The engineer, the fireman, and Wilkey testified that when the car was disconnected it was going from 12 to 15 miles an hour, and when the plaintiff attempted to board it it was going from 10 to 12 miles an hour. A number of witnesses experienced in switching and in railroading testified that an average switchman could safely board a moving car going 15 miles an hour. The plaintiff called a witness in rebuttal, an experienced switchman, who testified that in making a flying switch with two switchmen a speed of from 5 to 6 miles an hour was a reasonable speed; but he did not, nor did any witness, testify that it was unsafe for an experienced switchman to board a moving car going at a speed greater than 5 or 6 miles an hour, or at 10 or 15 miles an hour.

The track on which the car was operated was level. The car, to reach a clearance point on track No. 1, was required to pass over several switches, which tended to retard its speed. The distance from the switch where the plaintiff attempted to board the car to the clearance point on track No. 1 was about 480 feet. Testimony was given to show that the water tank car struck the oil tank car on track No. 1 with such force as to injure and damage both cars, and tip or throw over an empty box car just beyond the oil tank car. Testimony also was given, by the persons whom the plaintiff testified he thought were at or about the cars on track No. 1, that they were not at such cars, or in that part of the yard, after the oil tank car had been switched out of the fruit block train, an interstate train, and placed on track No. 1, and that they were not about such track when the flying switch was made. A rule of the defendant also was put in evidence, to the effect that running switches must not be made when practical to avoid doing so, and that "there must be a man on the car at the brake before

the car is uncoupled." The plaintiff was a man of maturity and experienced in railroad work, having worked for the defendant as a switchman in the yard at Lynndyl for 14 months prior to his injury, and for 5 or 6 years prior thereto working for other railroad companies as a switchman, and doing all kinds of railroad work.

It of course is conceded that the defense of assumption of risk is available to the defendant as a complete defense under the Federal Employers' Liability Act. It also is well settled and is not disputed that as a general proposition, and in the absence of any agreement to the contrary, a servant by his contract of employment, either expressly or impliedly, agrees to assume all risks ordinarily or obviously incident to the employment, and that it is presumed the contract was made with reference to such risks. 39 C. J. 705. It also is well settled, and not seriously disputed, that a servant engaged in the operation of trains, the boarding and riding of moving cars and engines, the switching of cars according to the ordinary and customary methods, and coupling or uncoupling cars, assumes the risks ordinarily incident to that kind of work, and that the general rule that a servant assumes the ordinary risks and hazards incident to the work for which he is employed applies to servants of a railroad company in all branches of the service, and that the operation of such rule is in no way affected by the provisions of the Federal Employers' Liability Act. 39 C. J. 716-718.

It also is well settled that the basis for charging a servant with an assumption of risk of his employment is knowledge by him of the risk and an appreciation or comprehension of the attending danger. If the risk is ordinarily incident to the employment, the servant by his contract of employment either expressly or impliedly assumes it although he may not have had actual knowledge of it; for he is held to a presumption of such knowledge and a comprehension of the danger attending it, if he is a man of maturity and of experience in the work to be performed by him. If the risk

is extraordinary or unusual, or if the danger is one created by the negligence of the master, the risk is not assumed by the servant, unless the risk and danger are known to and appreciated by the servant, or are so open and obvious as to presume knowledge.

Such is familiar doctrine, recognized in this and in other jurisdictions and in substance is not controverted by the plaintiff. It is in support of such rule that the cases cited by the defendant—*Seaboard Air Line Ry.* v. *Johnson,* 217 Ala. 251, 115 So. 168; *Jacobs* v. *Southern Ry.,* 241 U. S. 229, 36 S. Ct. 588, 60 L. Ed. 970; *Butler* v. *Frazee,* 211 U. S. 459, 29 S. Ct. 136, 53 L. Ed. 281; *New York, C. & St. L. R. R.* v. *McDougall* (C. C. A.) 15 F. (2d) 283; *Johnson* v. *Terminal Ry. Ass'n* (Mo. Sup.) 8 S. W. (2d) 891—chiefly relate.

But it is urged by the plaintiff that the risk and danger were extraordinary and unusual, that they were created by the negligence of the master, the negligence of the engineer, for whose negligence the defendant under the act is responsible, and that the conduct of the plaintiff in attempting to board the car and retard its speed or to stop it was influenced and induced by an imminent peril threatening great loss and injury to the defendant's property and great injury to other employees. The cases cited and relied upon by the plaintiff are *Chesapeake & O. Ry.* v. *De Atley,* 241 U. S. 310, 36 S. Ct. 564, 566, 60 L. Ed. 1016; *Cincinnati, N. O. & T. P. Ry. Co.* v. *Thompson* (C. C. A.) 236 F. 1; *Chesapeake & O. Ry.* v. *Proffitt,* 241 U. S. 462, 36 S. Ct. 620, 60 L. Ed. 1102; *Washington & G. R. R. Co.* v. *McDade,* 135 U. S. 554, 10 S. Ct. 1044, 34 L. Ed. 235; *Choctaw, O. & G. R. R. Co.* v. *McDade,* 191 U. S. 64, 24 S. Ct. 24, 48 L. Ed. 96; *Butler* v. *Frazee,* 211 U. S. 459, 29 S. Ct. 136, 53 L. Ed. 281; *Schlemmer* v. *Buffalo, R. & P. Ry.,* 220 U. S. 590, 31 S. Ct. 561, 55 L. Ed. 596; *Texas & P. Ry. Co.* v. *Harvey,* 228 U. S. 319, 33 S. Ct. 518, 57 L. Ed. 852; *Gila Valley, G. & N. Ry. Co.* v. *Hall,* 232 U. S. 94, 34 S. Ct. 229, 58 L. Ed. 521; *Seaboard Air Line Ry. Co.* v. *Horton,* 233 U. S. 492, 34 S. Ct.

635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475, and 1 Roberts, Federal Liability of Carriers, § 561.

But in such cases questions of imminent peril or of an emergency were not involved nor considered. It, however, has been held that the doctrine of assumption of risk does not apply where the servant is met or confronted with an emergency which does not afford him opportunity to exercise an option or election to remain in the employment and proceed with the work of the master. It also has been held that the operation of the general rule of assumption of risk is not affected by the fact that the servant continued in a place of danger to save fellow servants from injury. 39 C. J. 784, and cases there cited. In *Johnson* v. *Terminal Ry. Ass'n,* supra, cited by the defendant, it was held that the doctrine of imminent peril applies only where it appears it was necessary to save life or limb, and that it does not apply where mere danger of injury to property is involved.

The doctrine is more frequently applied to questions of contributory negligence than to assumption of risk. In such particular the general rule may be said to be that persons who are placed in a position of sudden peril, through the negligence of others, are not expected or · required to act with the same deliberation, care, and foresight as persons who have time to reflect and determine what is necessary or what ought to be done to protect themselves from danger, and that, as a general rule, contributory negligence will not be imputed to a servant who, while acting within the scope of his duties, attempts in the face of imminent peril to protect others from death or personal injury.

The doctrine in some instances has also been applied, where the servant in an emergency attempted to save his master's property and was injured while so doing. 39 C. J. 899, 901, 902, and cases there cited. In 3 Labatt, Master & Servant (2d Ed.) § 1277, the author says:

"The courts have sometimes allowed the action to be maintained upon the theory, that, when a servant is suddenly confronted by an emergency in which his master's property is threatened with destruc-

tion or serious injury, the fact that he attempted to preserve that property, and in doing so exposed himself to greater risks than would have been encountered by a prudent person who was thinking only of his own safety, will not necessarily render him chargeable with contributory negligence.

"This doctrine, however, does not afford any protection to a servant whose conduct was essentially rash. It does not justify him in going into a place in which he will be exposed to an imminent peril which may at any moment eventuate in disaster. Nor does it serve as an excuse where the damage with which the property was threatened was comparatively slight, when considered with relation to the extremely dangerous nature of the course of action pursued with a view to saving it. It is also conceded that less indulgence should be shown to a servant whose dangerous course of action was prompted merely by a desire to preserve his master's property, than to a servant whose impelling motive was his solicitude for the safety of human beings."

Assuming, without deciding, that the imminent peril or emergency doctrine applies, not only to questions of contributory negligence, but also to assumption of risk, and that the doctrine applies, not only in cases where the servant acts in an endeavor or not only to save life or to prevent injury to others, but also to save or protect ■ property from great loss or destruction, yet we are of the opinion that the evidence is insufficient to bring the plaintiff within such rule. In other words, the allegations in the complaint, that unless the plaintiff boarded and stopped the car there was "great and imminent danger" of "great and irreparable loss" of property, or of personal injury to others, are not sustained by the evidence.

The likelihood of injury to any one about the track or in the yard from a collision of cars was extremely remote, if not improbable. There is evidence to show that one or two of the defendant's employees were about cars in that vicinity when the oil tank car was switched on track No. 1, two or three hours before the flying switch was made; but there is no evidence to show that any one was there or in danger of injury when the water tank car was being switched on the track. The one or two employees, whom

the plaintiff testified he thought were about such track when the switching of the oil tank car on that track was made, were shown not to be about such place when the switching was made of the water tank car. Nor did the plaintiff testify that when he attempted to board the car he saw any one on or about track No. 1, or that he had knowledge that any one then was about that track, or otherwise in danger of injury from a collision of cars on that track. We may thus dismiss the feature that the life or limb of any one on or about track No. 1, or about the yard, or otherwise, was in peril. This conclusion is strengthened by the fact that by the undisputed evidence no flag was displayed on any of the cars on track No. 1.

Though it be assumed that the same rule applies where the servant attempts to prevent loss or damage to property as it does to protect life, or to prevent injury to others, and though the plaintiff might have been justified in anticipating that some damage to cars would result, if the speed of the car which was attempted to be boarded by him was not arrested or retarded, nevertheless his attempting to board the car for such purpose did not relieve him from the operation of the general rule of assumption of risk, for, as was apparent, the damage with which any property was threatened was comparatively slight, when considered with relation to the danger and injury to himself by attempting to board the car, and in pursuing the course of action pursued by him with a view and for the purpose of saving property. Though it be assumed that the car being switched was going at a speed that unless arrested, would collide with other cars on track No. 1, yet the plaintiff, a man of maturity and of much experience in switching and in railroad work, must be held to know that a collision under the circumstances of a car being switched on a level track and required to run on its own momentum a distance of about 480 feet before striking a car on track No. 1, ordinarily would not result in such great injury and damage as to justify or excuse himself in

exposing himself to the likelihood of injury, if the car was moving at such a speed that it could not be boarded with safety.

There no doubt may be instances where a servant in an emergency is suddenly confronted with an extraordinary or unusual danger, under circumstances where there is no time for consideration, or where, under excitement, the servant may not fully appreciate or comprehend the attending danger, or where he has no choice of action, that the general rule or doctrine of contributory negligence and of assumption of risk, or at least not to its full extent, may not apply. But, from a reading of the texts and cases, we on the record do not find that the plaintiff was confronted with such an emergency. Since the evidence is insufficient to support the allegations in the complaint of an imminent peril or of an emergency, we thus further consider the case with such feature eliminated.

It, of course, is not disputed that, if the risk of boarding the car was one ordinarily incident to the work performed by the plaintiff, he assumed it. He, however, asserts that the risk was extraordinary or unusual, that it was one created or occasioned by the negligence of the defendant operating the car before and at the time it was disconnected at an excessive and negligent speed, and thereby the plaintiff was not afforded a reasonably safe opportunity or means to disconnect the car or to board it after it was disconnected.

In support of that the plaintiff most strongly relies on the case of *Chesapeake & O. Ry.* v. *De Atley,* supra. There the plaintiff was a head brakeman. While the train at a station stopped for water and coal, the engineer directed the brakeman to go forward to a tower and ascertain from the operator if the train had time to go to the next station. Obtaining this information, the brakeman descended from the tower to a platform in front of it, and opposite the railroad track, and there saw the train approaching him, and waited for it. When it reached him, he attempted to board

the engine. As the train was coming towards him, he could not accurately judge the speed of it; but it appeared to him to be coming slowly enough for him to board it. He caught hold of the grabiron and put one foot on the step, but the speed of the train and his weight caused his foot to slip, and caused him to lose his hold, so that he fell between the wheels of the tender and was injured. The train was running about 12 miles an hour. The court said:

"Whether the risk was an extraordinary risk depended upon whether the speed of the train was greater than plaintiff reasonably might have anticipated; and this rested upon the same considerations that were determinative of the question of the engineer's negligence. If the jury should find, as in fact they did find, that the speed of the train was unduly great, so that the risk of boarding the engine was an extraordinary risk, the question whether plaintiff assumed it then depended upon whether he was aware that the speed was excessive, and appreciated the extraordinary danger; or, if not, then upon whether the undue speed and the consequent danger to him were so obvious that an ordinarily prudent person in his situation would have realized and appreciated them."

Stress was laid on the propositions among others, that the brakeman had the right to assume the engineer would run the train at a speed that would enable him to get on in safety, and that it was common knowledge that one facing a train coming directly toward him could not, in such position, form an accurate judgment of the speed until it came quite near him, and that the brakeman's opportunity to observe the speed was limited to the brief space of time that elapsed between the passing of the front end of the engine and the cab. The holding thus was that the question of assumption of risk was for the jury.

We perceive here a different situation and a different state of facts. The plaintiff was on the running board or platform of the engine, preparatory to disconnect the car. He, according to his own testimony, knew and claimed the engineer was operating the engine and the car attached thereto at an excessive speed. He testified the speed was

20 miles or more an hour.  He further testified he several times signaled the engineer to slow down, and gave him a stop signal; that others likewise gave the engineer slow-down signals and to decrease the speed, but the engineer did not heed the signals, and, if anything, increased the speed.  He further testified the engineer operated the engine in such a negligent manner as to throw him against the lever of the pin, whereby the pin was accidentally drawn and the car disconnected; that after the car was disconnected he continued to ride the engine to the switch, where he dismounted and waited to board the oncoming disconnected car on its own momentum.  He testified it "came down in a flash," which he thought at the time was at a speed between 10 and 12 miles an hour, but as he viewed it subsequent to the accident, and after what had taken place, he thereafter—at the time of the trial—judged the speed was 15 to 18 miles an hour.

Thus, assuming that the jury was justified in finding that the car was operated at an excessive speed, yet it is clear that the plaintiff had full knowledge of that, signaled the engineer to decrease the speed, knew that the signals were unheeded, and that the speed was not decreased.  So whatever negligence was committed by the defendant in operating the car at an excessive speed was fully known to the plaintiff when the car was disconnected, when he dismounted the engine, and when he attempted to board the car.  Being a man of maturity and of experience, he must be held to know and appreciate the risk or danger of boarding a moving car, and if operated at an excessive speed, of which he has knowledge, the increased risk and danger created thereby are just as open and obvious to him as an ordinary risk in boarding a moving car at a reasonable speed.

Further, there is no substantial evidence in the record to show that the speed of the car, when attempted to be boarded by the plaintiff, exceeded 10 or 12 miles an hour.  And the evidence, without substantial dispute, shows that

an experienced switchman can board a moving car with safety at such a speed. The only evidence that the car, when plaintiff attempted to board it, exceeded a speed of 10 or 12 miles an hour, was his testimony that, as he viewed the matter subsequent to the accident, and after what had happened, and as he viewed it on the witness stand, it was his judgment that the speed was from 15 to 18 miles an hour, and from whatever inference may be deduced that the car struck the oil tank car with such force as to tip or throw over the empty box car. In the nature of it, the legal probative effect of such testimony is of such doubtful quality as hardly to raise a conflict with the testimony of all the witnesses, including the plaintiff, who observed the speed of the car when he attempted to board it, that the speed was from 10 to 12 miles an hour, the speed at which the plaintiff testified he thought it was going when he attempted to do so. Certainly his riding the engine when the car was being moved from the tank, signaling the engineer to decrease the speed, knowing the speed when the car was disconnected, dismounting the engine, and waiting to board the car, gave him a much better opportunity of judging the speed than by, subsequently to the accident, considering and viewing what had happened.

We do not say that operating the car at 10 or 12 miles an hour a jury may not find was an unreasonable and a negligent speed. What we say is that the speed at which it was operated, at 10 or 12 miles an hour or at a greater speed, was known to the plaintiff. The primary factors in the De Atley Case were that the servant attempting to board the moving train had no opportunity of judging, and did not know, its speed, and had the right to assume that it was being run at a speed to permit him to safely board it. Such factors, as we have seen, are not here present.

We thus are of the opinion that on the record the verdict ought to have been directed on the ground of assumption of risk. The judgment of the court below is therefore re-

versed, and the case remanded for a new trial. Costs to the appellant.

CHERRY, C. J., and ELIAS HANSEN, EPHRAIM HANSON, and FOLLAND, JJ., concur.

## ON PETITION FOR REHEARING.

STRAUP, J. (for the court). A petition for a rehearing is filed by the respondent. It, among other things, is urged that because of law of the case we were precluded from considering the question of assumption of risk on merits. It is contended that the railroad company, by cross-assignments or otherwise, could have presented the question on the first appeal, and, having failed to do so, may not now on the same evidence be heard thereon on this appeal. Because the judgment rendered by us on the first appeal, reversing the judgment of the court below and remanding the cause for a new trial, being not a final judgment, and hence not appealable or otherwise subject to review by the Supreme Court of the United States at that stage of the proceedings on the application of either party, we regarded what was decided on the first appeal as not the law of the case, precluding the parties from being heard on the merits of the cause on this appeal.

In some jurisdictions it has been held that, where a decision is rendered by an intermediate court of appeals, *and an appeal or other remedy is open to the losing party to have such decision reviewed in a court of last resort,* if he fails to avail himself thereof and allows the case to be remanded for further proceedings, and thereafter appeals to the intermediate court and thence to the court of last resort, the points decided by the intermediate court on the first appeal will be regarded as the law of the case, not only as to the intermediate court, but also as to the court of last resort and will not there be reexamined. The cases are collected and noted in the case of *Gohman* v. *St. Bernard,* reported in 111 Ohio St. 726, 146

N. E. 291, 41 A. L. R. 1078. Seemingly *Silva* v. *Pickard,* 14 Utah 245, 47 P. 144, is to that effect. But in other jurisdictions the rule is that, where there have been two or more appeals to an intermediate court, and the case finally goes before the court of last resort, that court will review it to the extent which the record before it permits, without regard to any previous decision of the intermediate court. The cases so holding are there also noted. Within that rule are the decisions of the Supreme Court of the United States.

We think such is the correct rule. Though the first-stated rule should be regarded as the correct rule, yet the case in hand does not fall within it, for the judgment rendered by us on the first appeal, not being final, was not appealable or subject to review at that stage of the proceedings. Since the Supreme Court of the United States is the final adjudicator and the court of last resort on questions of interstate commerce and of assumption of risk under the Federal Employers' Liability Act (45 U. S. C. A. §§ 51-59), as well as to all other constructions of the act, it is clear that no matter what we may have decided on the first or on this appeal with respect to such questions can in no sense be the law of the case, binding on or applicable to the Supreme Court of the United States. Thus, if what respecting such questions may have been decided on the first appeal is not the law of the case, applicable to the Supreme Court of the United States, we do not well see how it may become the law of the case applicable to us on the second appeal.

We thus regarded both questions of interstate commerce and assumption of risk as at large, and so considered and determined them on the record presented on the second appeal. Upon such consideration we felt content with the ruling made by us on the first appeal as to the question of interstate commerce, and thus reaffirmed such ruling. The question of assumption of risk was also considered at large on merits. True, as is urged, the railroad company, on the first appeal, by cross-assignments or otherwise, could have defended the ruling of the court below directing a verdict in

its favor, by presenting the question but it in no manner did so. However, since what we expressly decided on the first appeal did not become the law of the case, we thing it necessarily follows that what could have been presented and decided on that appeal, but was not, likewise did not become the law of the case.

A rehearing also is urged upon the ground that we as an original proposition erred in holding that the plaintiff assumed the risk as matter of law, and that the question ought to have been, as it was, submitted to the jury as a question of fact. Upon further consideration of the question, and of the additional authorities cited, we are still content with the ruling made by us. The principal elements of assumption of risk as applied to interstate commerce employees under the federal act, consist of two kinds, ordinary and extraordinary. The former are those usually and normally incident to the occupation in which the employee voluntarily engages. Such risks, by a mature and experienced employee, are assumed by him, on the theory that he is conclusively presumed to have knowledge of them and to have assumed injuries arising therefrom. Risks not naturally incident to the employment, but which arise from the negligence of the carrier, are not assumed, unless the employee has knowledge of them and appreciates the danger arising therefrom, or unless the risk and danger are so obivious as to presume knowledge and appreciation. 2 Roberts Fed. Liabilities of Carriers (2d Ed.) § 831 et seq., and cases cited, including cases of the federal courts.

As pointed out in our opinion, whatever negligence was committed by the appellant, the railroad company, in switching and operating the tank car at an excessive and negligent speed, was known to the respondent, when he was on the running board of the engine and signaled the engineer to slow down, and knew that the engineer gave no heed to the signals, knew the speed at which the tank car was operated when it was disconnected, and when the plaintiff dismounted the engine and attempted to board the car. He, as well as

if not better than any one at or about the transaction, had opportunity to judge and know the speed of the tank car when he attempted to board it.

We also are again reminded that the act of the plaintiff in attempting to board the tank car involved elements of contributory negligence rather than assumption of risk, and that the jury by its verdict diminished the total amount of plaintiff's damage by $5,000. That there is a clear and practical distinction between assumption of risk and contributory negligence is well settled by the Supreme Court of the United States and by other courts. The matter is discussed and cases cited in 2 Roberts, Fed. Liabilities of Carriers, § 836 et seq. While Mr. Justice Holmes, in the first case of *Schlemmer* v. *Buffalo, R. & P. Co.*, 205 U. S. 1, 27 S. Ct. 407, 409, 51 L. Ed. 681, said that assumption of risk "obviously shades into negligence as commonly understood," and that "the difference between the two is one of degree rather than of kind," yet, on the second review of the same case (220 U. S. 596, 31 S. Ct. 561, 563, 55 L. Ed. 596), Mr. Justice Day said that there was "a practical and clear distinction between the two," and that assumption of risk rested on knowledge of the risk and appreciation of danger, while contributory negligence rested on the omission of the employee to use those precautions for his own safety which ordinary prudence requires.

The distinction is defined in the case of *Seaboard Air Line R. Co.* v. *Horton*, 233 U. S. 492, 34 S. Ct. 635, 639, 58 L. Ed. 1062, L. R. A. 1015C, 1, Ann. Cas. 1915B, 475, where it is said:

"The distinction, although simple, is sometimes overlooked. Contributory negligence involves the notion of some fault or breach of duty on the part of the employee; and since it is ordinarily his duty to take some precaution for his own safety when engaged in a hazardous occupation, contributory negligence is sometimes defined as a failure to use such care for his safety as ordinarily prudent employees in similar circumstances would use. On the other hand, the assumption of risk, even though the risk be obvious, may be free from any suggestion or fault or negligence on the part of the employee. The

risks may be present, notwithstanding the exercise of all reasonable care on his part."

The are numerous other cases to the same effect. Among them may be noted *Choctaw, O. & G. R. Co.* v. *McDade*, 191 U. S. 64, 24 S. Ct. 24, 48 L. Ed. 96, and *Yazoo & M. V. R. R. Co.* v. *Wright*, 235 U. S. 376, 35 S. Ct. 130, 59 L. Ed. 277. See, also, 39 C. J. 1240; 3 Labatt, Master & Servant (2d Ed.) 3310-3315. And it is clear that the act itself makes a distinction, for the one is regarded a complete defense, and the other only a defense pro tanto.

Here it is not shown that the plaintiff's act in attempting to board the car was done in a careless or negligent manner, but that in making the attempt in as careful a manner as he could he took the chance of injury from a risk and danger known to and appreciated by him. On the record we, of course, cannot tell what omitted or committed act of the plaintiff was regarded by the jury as contributory negligence. It, among other things, was urged by the railroad company that the plaintiff was guilty of negligence, when the flying switch was made, by his taking a position on the running board of the engine, instead of on the front platform of the car, in which case he would have been on the car after it was disconnected, and could have controlled its movements, without being required to board it after it was disconnected. Whether the jury, on that or some other issue, found the plaintiff guilty of contributory negligence, cannot be determined from the verdict.

The application for a rehearing is denied. But, inasmuch as it has been represented and made to appear that on a retrial of the case the evidence with respect to the issue of assumption of risk would in all essentials be the same as shown by the record on this appeal, and that on a retrial neither party would have any other or further evidence to offer, and that, in view of our holding on the question of assumption of risk, the trial court thus on a retrial would be required to direct a verdict in favor of the defendant of

no cause of action and to dismiss the case, our former order that the cause be remanded for a new trial is vacated and modified, and an order now made in lieu thereof dismissing the action. In other respects, our opinion and judgment may stand.

So, in view of the premises, the judgment of this court is that the judgment of the court below is reversed, and the action dismissed on merits.

All the Justices concur.